**FEDERAL ELECTION COMMISSION,
et al., Appellants,**

v.

**Congressman Charles G.
ROSE, Appellee.**

**No. 85–1455.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 12, 1986.

Decided Dec. 2, 1986.

As Amended Dec. 2, 1986.

Richard B. Bader, Asst. Gen. Counsel, Federal Election Com'n, with whom Charles N. Steele, General Counsel and David I. Futter, Attorney, Federal Election Com'n Washington, D.C., were on the brief, for appellants. Carol A. Laham, Atty., Federal Election Com'n, Washington, D.C., also entered an appearance, for appellants.

William C. Oldaker, with whom Jane M. Kramer and David H. Larry, Washington, D.C., were on the brief, for appellee.

Before EDWARDS, RUTH BADER GINSBURG and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

In this interlocutory appeal, the Federal Election Commission challenges the District Court's determination that the Commission is liable to Congressman Charles G. Rose under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (1982 & Supp. III 1985), for litigation costs and attorney's fees incurred in a suit to compel agency action. The suit was brought to require action on the Congressman's administrative complaint charging violations of the Federal Election Campaign Act. We conclude that, under the standards governing EAJA fee awards, the District Court erred in holding that the FEC's position in this case was not "substantially justified."

## I

Congressman Rose represents the Seventh Congressional District of North Carolina. The Congressman filed an administrative complaint with the FEC on October 29, 1982, just days before the November 1982 elections in which he successfully sought reelection. The complaint named several respondents and attributed to them various violations of the Federal Election Campaign Act (the "Campaign Act"), 2 U.S.C. §§ 431–455 (1982 & Supp. III 1985). Congressman Rose charged, among other things, that Jefferson Marketing, Inc. ("JMI") had violated the Campaign Act by making certain political contributions during the 1982 Congressional campaign and that, because JMI was merely an extension of the National Congressional Club ("NCC"), the NCC had likewise violated the Campaign Act by failing to report these contributions.

As required by the Campaign Act, the Commission notified JMI and NCC of the Congressman's complaint and gave the two respondents an opportunity to explain why the FEC should take no action. See 2 U.S.C. § 437g(a)(1), (a)(2).[1] Respondents submitted their replies in December 1982, which was, of course, after the mid-term elections of the previous month. In April 1983, the Office of General Counsel recommended to the Commission that it find "reason to believe," see supra note 1, that respondents had violated the Campaign Act. In May 1983, the Commission did so. See 2 U.S.C. § 437g(a)(2).

The Commission then instituted an investigation destined to last from May 1983 through August 1984. Respondents resisted the investigation, impelling the Commission in February 1984 to file suit in federal

1. The statute provides a means by which persons who believe violations of the Campaign Act have occurred may have the violations investigated. After a complaint is filed, the Commission must notify the alleged violator (denominated in the statute the "respondent") within 5 days. 2 U.S.C. § 437g(a)(1). Unless the Commission dismisses the complaint on its own, it must give the respondent 15 days after notification to argue that the Commission should not act on the complaint. On the basis of the complaint and response, the Commission determines whether there is "reason to believe" a violation of the Campaign Act has occurred. Id. § 437g(a)(2). Such a determination obligates the Commission, through its Office of General Counsel, to institute an investigation.

On the basis of its investigation, the Office of General Counsel advises the Commission whether there is "probable cause" to believe a violation has occurred. Id. § 437g(a)(3). The respondent then has another opportunity to reply. Id. If the Commission thereafter votes to find probable cause, it must attempt informal resolution of the matter for at least 30 days but no more than 90. Id. § 437g(a)(4)(A)(i). If these informal methods fail, the Commission may bring a civil action to remedy the violations. Id. § 437g(a)(6).

district court in North Carolina to enforce its subpoenas. On August 22, 1984, the General Counsel recommended to the Commission that it find "probable cause to believe" that respondents had violated the Campaign Act. *See supra* note 1. Respondents replied to this recommendation on September 21, 1984. On October 9, 1984 the General Counsel's Office renewed its recommendation that probable cause be found. The Commission made this finding on October 30, 1984 and, as directed by the Campaign Act, undertook conciliation efforts. *See id.* § 437g(a)(4)(A). These efforts were generally successful, culminating in conciliation agreements with all respondents except JMI and NCC. Soon after the 90–day maximum period for conciliation efforts expired, *see id.* § 437g(a)(4)(A)(i), the Commission filed suit in the Eastern District of North Carolina alleging violations of the Campaign Act by JMI and NCC. *FEC v. National Congressional Club*, No. 0424–Civ.–5 (E.D.N.C. filed Feb. 7, 1985); *see* 2 U.S.C. § 437g(a)(6).

Dissatisfied with the progress of the FEC's investigation, Congressman Rose in June 1983 filed suit against the Commission in the United States District Court for the District of Columbia. Rep. Rose alleged that the FEC's failure to take final action on his complaint violated the Campaign Act. *Rose v. FEC*, No. 83–1687 (D.D.C. filed June 13, 1983), Joint Appendix ("J.A.") at 32. Eight months later, however, Mr. Rose reversed his decision to litigate. On February 16, 1984, the day after the Commission filed suit in federal district court in North Carolina, the Congressman voluntarily dismissed his suit

here in Washington without prejudice. This lull in the litigation storm proved only temporary, however, as Mr. Rose filed another suit, in July 1984, advancing the same contentions against the Commission. *Rose v. FEC*, No. 84–2278 (D.D.C. filed July 24, 1984), J.A. at 16.

In his second action to compel agency action (filed, as noted above, in July 1984), Rep. Rose moved for summary judgment in September 1984, advancing two arguments to buttress his claim that the FEC's delay in investigating his complaint violated the Campaign Act. He argued, first, that the statute requires the Commission to take final action on an administrative complaint within 120 days of filing, 2 U.S.C. § 437g(a)(8).[2] In the alternative, the Congressman argued that the Campaign Act requires the FEC to take final action within a reasonable time, which means, for complaints filed near the beginning of an election cycle, before the end of that election cycle (November 1984, in this case).[3] Vigorously contesting both positions, the Commission argued that the 120–day period set forth in the statute merely specifies how long a complainant must wait before filing a complaint. *See supra* note 2. The FEC further argued that the Campaign Act neither expressly nor impliedly requires final action within an election cycle. Instead, the FEC maintained, the court shall decide whether the Commission's delay was "contrary to law" within the meaning of the statute, 2 U.S.C. § 437g(a)(8), by applying the general principles of administrative law developed to determine whether agency action is "arbitrary" or "capricious" or other-

---

**2.** 2 U.S.C. § 437g(a)(8) provides:

(A) Any party aggrieved by an order of the Commission dismissing a complaint filed by such party under [2 U.S.C. § 437g(a)(1)], or by a failure of the Commission to act on such complaint during the 120–day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia.

(B) Any petition under subparagraph (A) shall be filed, in the case of a dismissal of a complaint by the Commission, within 60 days after the date of the dismissal.

(C) In any proceeding under this paragraph the court may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint.

**3.** *See* Memorandum in Support of Motion of Plaintiff Charles G. Rose for Summary Judgment 6–8, J.A. at 27–29.

wise violative of the Administrative Procedure Act, 5 U.S.C. § 706 (1982).[4]

The District Court granted summary judgment in favor of Mr. Rose on October 4, 1984, and ordered the Commission to determine within 15 days whether there was probable cause to believe that respondents had violated the Campaign Act, or show cause why it could not do so. *Rose v. FEC*, No. 84–2278 (D.D.C. Order dated Oct. 4, 1984), J.A. at 52. The court's disposition was premised on its conclusion that the Campaign Act contains a presumption that the Commission acts "contrary to law" unless it takes final action on complaints within an election cycle.[5]

The Commission promptly appealed to this court, seeking summary reversal of this decision on two grounds: *first*, that the District Court's interpretation of the Campaign Act to require Commission resolution of complaints within an election cycle was without foundation in law; and, *second*, that the 15–day order contravened the clear and unambiguous language of the statute, § 437g(a)(8)(C), which permits a court to order the Commission to act within *30* days. *See supra* note 2. We agreed with both arguments, summarily reversed the judgment on both grounds, and remanded the case. We concluded that in determining whether the Commission's treatment of a complaint is "contrary to law" within the meaning of § 437g(a)(8), the court should apply the factors set forth in *Common Cause v. FEC*, 489 F.Supp. 738, 744 (D.D.C.1980), and *Telecommunications Research & Action Center v. FCC*

*(TRAC)*, 750 F.2d 70, 80 (D.C.Cir.1984), a decision handed down on the same day as our summary reversal.[6] *See Rose v. FEC*, No. 84–2278 (D.C.Cir. Order dated Oct. 24, 1984), J.A. at 90.

On remand, Congressman Rose again sought summary judgment. He argued that the Campaign Act obligated the Commission to act expeditiously; in Rep. Rose's view, the Commission's failure to resolve his administrative complaint within two years and its inadequate justification for this delay violated this obligation.[7] The Commission renewed its argument, with which this court had agreed, that its conduct was to be analyzed under the deferential standards elaborated in *Common Cause* and *TRAC*. *See supra* note 6. To support the reasonableness of its conduct, the Commission cited, as before, the novelty and complexity of the issues raised by Mr. Rose's complaint, the respondents' firm resistance to the Commission's investigation, and the large workload attendant to the 1984 Presidential election. Finally, it argued that *TRAC* required the court to decline review altogether, since the Commission was then proceeding promptly toward resolution of Rep. Rose's complaint.[8] *See TRAC*, 750 F.2d at 80.

Reviewing the Commission's conduct under the criteria of *Common Cause* and *TRAC*, the District Court again granted summary judgment in favor of Congressman Rose. *See Rose v. FEC*, No. 84–2278 (D.D.C. Memorandum & Order dated Oct. 30, 1984), J.A. at 111, 117. Under the first *TRAC* factor, the court found that the

---

**4.** *See* Memorandum of the FEC in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment 9–13, J.A. at 41–45.

**5.** *See Rose v. FEC*, 608 F.Supp. 1, 6–8 (D.D.C.1984), J.A. at 65–68.

**6.** The court in *Common Cause* enumerated several factors for determining whether agency delay is "contrary to law" within the meaning of 2 U.S.C. § 437g(a)(8)(C): (1) the credibility of the allegations made in the administrative complaint; (2) the nature of the threat posed by the violations alleged; (3) the resources available to

the Commission for investigating the complaint; (4) the information available to the Commission; and (5) the novelty of issues raised by the complaint. 489 F.Supp. at 744. In *TRAC*, this court enumerated and discussed six factors for determining whether agency action has been unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1). *See* 750 F.2d at 80.

**7.** Plaintiff's Memorandum in Support of Motion for Reconsideration on an Expedited Basis 2–4, J.A. at 93–95.

**8.** Response to Plaintiff's Motion for Reconsideration, Submitted Under Seal, 2–9, J.A. at 101–08.

FEC's failure to complete its investigation of a 1982 administrative complaint before the 1984 election violated a "rule of reason." *Id.* at 5–7, J.A. at 120–21. The court applied the second *TRAC* factor to discern "statutory indication[s]" in the Campaign Act that Congress intended the Commission to act more quickly than it had in this case. *Id.* at 7–10, J.A. at 121–22. Under the third *TRAC* factor, the court reasoned that because of the sensitive nature of the electoral process, delay was less tolerable than under a regime of economic regulation. *Id.* at 10, J.A. at 122. In accordance with the fourth *TRAC* factor, the court concluded that ordering the Commission to act would not disrupt the Commission's other investigations. *Id.* at 10–11, J.A. at 122–22a. Finally, as indicated by *TRAC's* fifth factor, the court decided that the Commission's delay had caused significant prejudice in this case. *Id.* at 11, J.A. at 122a.

Congressman Rose thereupon filed his application under EAJA for attorney's fees and litigation costs. The District Court determined that the Government was liable for costs and fees, relying primarily on *Spencer v. NLRB*, 712 F.2d 539 (D.C.Cir. 1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). In that decision, this court construed the EAJA as it existed prior to its extension and amendment in 1985—specifically, the provision that precludes recovery of costs and fees by a private party if the "position of the United States" is "substantially justified." *Id.* at 541. We held in *Spencer* that "position of the United States" refers to the Government's litigation position, not to the underlying agency action that spawned the litigation in the first instance. *Id.* at 557. We observed, however, that "[o]nly in a minority of cases does it matter whether a court ... looks to the government's original behavior or to its subsequent legal arguments" in determining whether the "position of the United States" was substantially justified. *Id.* at 552. We also held that the test of whether its position is "substantially justified" is "slightly more

stringent than one of reasonableness." *Id.* at 558.

Applying *Spencer*, the District Court treated Congressman Rose's action as a typical case, in which the Government's underlying action and its litigation position are equivalent for purposes of EAJA analysis. *Rose v. FEC*, No. 84–2278, at 6 (D.D.C. Memorandum Opinion dated May 24, 1985), J.A. at 205, 210. Accordingly, the court looked first to the underlying agency action and concluded, on the basis of its earlier determination, that "[t]he Commission's contention on the eve of the 1984 election that it had not unreasonably delayed action on plaintiff's 1982 complaint remains essentially untenable." *Id.* The court cited two additional reasons why the FEC's handling of Mr. Rose's complaint was not, in its view, substantially justified. First, the court speculated that the Commission would have delayed processing Congressman Rose's complaint even longer had he not filed suit. *Id.* at 7, J.A. at 211. Second, it criticized the Commission's decision to defend against the Congressman's onslaught in the first instance, reasoning that the Commission's action had prevented the trial court from granting judicial relief before the 1984 election. *Id.* at 6–7, J.A. at 210–11.

In addition to evaluating the agency conduct that led to litigation, the court examined the Commission's litigation position. Applying the criteria discussed in *Spencer* as pertinent to this examination, the District Court determined, *first*, that the legal standards for determining unreasonable agency delay were clear and, *second*, that the litigation of that action was foreseeably complex. *Id.* at 9–11, J.A. at 213–15; *see also Spencer*, 712 F.2d at 558–61. These findings, the court believed, warranted a conclusion that the FEC's litigation position was not "substantially justified."

## II

The Commission's challenge to the District Court's determination of liability for fees raises four issues: first, whether the original EAJA or the EAJA as amended

and extended in 1985 ("the EAJA Amendments") applies in this case; second, whether the District Court was correct to consider both the FEC's litigation position and the conduct that led to Rep. Rose's action in determining whether its "position" was substantially justified; third, determining the proper standard under which our court should review the District Court's decision; and finally, whether the District Court's determination that the FEC's position was not "substantially justified" survives application of the controlling standard.

### A

■ The first issue can be quickly resolved. Because the District Court ruled on the issue of liability in May 1985, before the EAJA Amendments were signed into law, it obviously had no occasion to consider whether the EAJA Amendments applied.

The FEC argues on appeal that this case was appropriately considered under the original EAJA rather than the EAJA Amendments because the latter apply only to cases pending on August 5, 1985, the effective date of the Amendments, and this case was not then "pending." *See* EAJA, Extension and Amendment, Pub.L. No. 99–80, § 7(a), 99 Stat. 183, 186 (1985) (codified at 5 U.S.C. § 504 Note (Supp. III 1985)).[9] We disagree. Our recent decision in *Center for Science in the Public Interest v. Regan (CSPI)*, 802 F.2d 518 (D.C.Cir.1986), is controlling. In CSPI, we held that a case

is "pending" on the effective date of the EAJA Amendments if the EAJA application is pending on that date, even if the merits have been finally resolved before then. *Id.* at 524.[10] This is indisputably such a case. Congressman Rose filed his EAJA application on November 30, 1984. The District Court has yet to determine the extent of liability. His application is therefore governed by the EAJA Amendments.

### B

■ The EAJA Amendments modified the original statute in several respects and made permanent those portions enacted as temporary provisions. *See* EAJA Amendments, 99 Stat. 183.[11] The only change pertinent to our analysis, however, is the addition of a definition of the term "position of the United States":

> "[P]osition of the United States" means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based....

*Id.* § 2(c)(2)(B), 99 Stat. 185 (codified at 28 U.S.C. § 2412(d)(2)(D) (Supp. III 1985)). In *Spencer* (which, of course, arose under the original EAJA), we undertook a careful analysis of the statute and construed "position of the United States" to mean the Government's position in the litigation. 712 F.2d at 557. By virtue of the 1985 Amendments, the Government must now show that both its position in the litigation

---

9. Section 7(a) of the EAJA Amendments provides:

> Except as otherwise provided in this section, the amendments made by this Act shall apply to cases pending on or commenced on or after the date of the enactment [August 5, 1985] of this Act.

5 U.S.C. § 504 Note (Supp. III 1985).

10. In *CSPI*, we acknowledged the line of precedent holding that cases "pending" under the original EAJA did not include those in which attorney's fees were the only matter left to be resolved on the effective date of the original statute. *CSPI*, at 524 n. 11 (citing *Nichols v. Pierce*, 740 F.2d 1249 (D.C.Cir.1984)). We explained, however, that "the concerns which prompted the courts to decline to apply retroactively the original EAJA to cases which were closed save for the fee petition are inapplicable

in the context of the application of the new definition of 'position' under the new Amendments." *Id.* Specifically, the original EAJA was temporary and experimental. Moreover, it was the first time that Congress had waived sovereign immunity for a wide variety of cases. These factors necessitated a strict reading of the term "position" in the original EAJA. *See id.*

11. In the original EAJA, Congress attached a sunset provision to § 204(a), which provided for fees and costs unless the Government's position was substantially justified. *See* EAJA, Pub.L. No. 96–481, § 204(c), 94 Stat. 2321, 2329 (1980) (codified at 28 U.S.C. § 2412 Note (1982)). In the EAJA Amendments, Congress made Section 204(a) permanent. *See* EAJA Amendments, § 6(b)(2), 99 Stat. 186 (codified at 5 U.S.C. § 504 Note (Supp. III 1985)).

and its conduct that led to the litigation were substantially justified.[12]

■ In *Spencer,* we set forth a comprehensive framework for determining whether the Government's position *in the litigation* is substantially justified. 712 F.2d at 557–65. We have not, on the other hand, had occasion heretofore to address in detail how a court determines whether the Government's *underlying action* is substantially justified. Of course, our evaluation of the underlying action, like that of the litigation position, must begin with the fact that the EAJA itself supplies a legal standard—"substantially justified"—that is separate and distinct from whatever legal standards governed the merits phase of the case. Thus, at the EAJA stage, the court is not wedded to the underlying judgment on the merits in assessing either the Government's litigation position or its underlying conduct. To the contrary, Congress' inclusion of the discrete legal standard makes clear that an independent evaluation through an EAJA perspective is required. *Cf. Martin v. Lauer,* 740 F.2d 36, 43 (D.C.Cir.1984) (court at EAJA stage not bound to find that Government's position was substantially justified merely because at trial on merits, Government prevailed) (citing *Cinciarelli v. Reagan,* 729 F.2d 801, 806 (D.C.Cir.1984)). The court assessing an EAJA application must deny costs and fees if, on the basis of this independent perspective, it concludes that the Government acted slightly more than reasonably, even though not in compliance with substantive legal standards applied in the merits phase. Only through a fresh look occasioned by application of the "substantially justified" standard can the court honor Congress' intent, manifest in the inclusion of this standard, not to permit a prevailing party automatically to recover fees. *See Spencer,* 712 F.2d at 550–51 & n. 44.[13]

Thus, a finding in the merits phase that the Government's underlying action was "arbitrary and capricious" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), does not compel an award of fees. We recognize full well the apparent anomaly in this result. In common parlance, a judicial condemnation of agency action as "arbitrary and capricious" seems entirely at odds with thereafter finding the action "substantially justified." But, as in other areas of the law, close analysis clarifies and justifies what at first blush appears to be an incongruous result. We turn, then, to an examination of why the apparent anomaly is not anomalous but is in fact sensible and reasonable.

Under the APA, a judicial labeling of an agency's action as "arbitrary and capricious" sets forth a legal conclusion. It is a standard against which courts measure all manner of governmental actions, some of which may represent reasonable policy choices but suffer from some defect in crafting or execution. *See generally Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850–53, 856–58 (D.C.Cir.1971)

**12.** In *Spencer,* we held that the Government bore the burden of proving that its position was substantially justified. 712 F.2d at 557; *see also* H.R.Rep. No. 120, 99th Cong., 1st Sess. 11 (Pt. I 1985), *reprinted in* 1985 U.S.Code Cong. & Ad. News 132, 140.

**13.** If a court adjudging entitlement to EAJA recovery were mechanically to infer from the Government's loss on the merits that its position was not substantially justified, it would effectively extirpate this standard from the statute. This standard, however, is one feature that distinguishes EAJA from other fee-shifting statutes—for example, those which require a party to demonstrate only that he or she has "substantially prevailed," *see, e.g.,* 5 U.S.C. § 552(a)(4)(E) (1982) (Freedom of Information Act); those which require a party to show that he or she has

"prevailed," *see, e.g.,* 42 U.S.C. § 2000e–5(k) (1982) (Title VII of Civil Rights Act of 1964); and those which allow courts to award fees "where appropriate," *see, e.g.,* 42 U.S.C. § 7607(f) (1982) (Clean Air Act); *see also Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983); *Sierra Club v. EPA,* 769 F.2d 796 (D.C.Cir.1985). EAJA thus reflects a trade-off. On the one hand, unlike prior fee-shifting statutes (which have applied only to actions brought under specific statutes), EAJA applies broadly to all actions by or against the Government save for those sounding in tort. On the other hand, EAJA expressly permits the Government to interpose a defense that requires a court faced with a fee application to make a judgment independent of that reached in the merits stage.

(discussing difficulty of applying "arbitrary and capricious" standard), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). As Judge McGowan put it in his characteristically felicitous way: "Rather than denoting a fixed template to be imposed mechanically on every case within their ambit, these words summon forth what may best be described as an attitude of mind in the reviewing court—one that is 'searching and careful,' yet, in the last analysis, diffident and deferential." *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1049 (D.C.Cir.1979) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)) (footnote omitted).

One need call to mind only a handful of recent cases to appreciate the wide range of reasons why agency action may be judicially branded as "arbitrary and capricious." For example, an agency action accompanied by an inadequate explanation constitutes arbitrary and capricious conduct. *See, e.g., North Germany Area Council v. FLRA,* 805 F.2d 1044 (1986); *Center for Science in the Public Interest v. Department of the Treasury,* 797 F.2d 995 (D.C.Cir.1986); *Celcom Communications Corp. v. FCC,* 789 F.2d 67, 70–71 (D.C.Cir. 1986). In some circumstances, a judgment as to the adequacy of an agency's explanation is not only one on which reasonable minds can and frequently do differ, but it is also logically unrelated to whether the underlying agency action is justified under the organic statute. *See Amoco Oil Co. v. EPA,* 501 F.2d 722, 739–41 (D.C.Cir.1974) (discussing criteria by which to judge adequacy of explanation); 1 *K. Davis, Administrative Law Treatise* § 6:12 (2d ed. 1979) (same); *see also Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *cf. Airmark Corp v.*

*FAA,* 758 F.2d 685, 692 (D.C.Cir.1985) (agency has affirmative burden to furnish adequate explanation where departing from prior policy); *Center for Auto Safety v. Peck,* 751 F.2d 1336, 1343 (D.C.Cir.1985); *United Municipal Distributors Group v. FERC,* 732 F.2d 202, 210–14 (D.C.Cir. 1984).[14]

Another subset of decisions illustrates the principle. A determination that an agency made a decision without considering a relevant factor leads to condemning the decision as "arbitrary and capricious." *See, e.g., Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 46–57, 103 S.Ct. 2856, 2868–69, 77 L.Ed.2d 443 (1983); *Center for Auto Safety,* 751 F.2d at 1342. Concluding that a factor is "relevant," like finding an explanation "inadequate," sometimes may reflect a judgment call about which reasonable grounds for disagreement exist. Thus, in a particular setting, an agency's failure to consider a relevant factor may be understandable, even though the failure contravenes the APA standard of avoiding "arbitrary and capricious" conduct. Accordingly, agency neglect of a relevant factor in reaching its decision does not invariably doom the decision itself to the ranks of unreasonableness, as is clear from the oft-stated principle that an agency may lawfully reach the same conclusion after taking the omitted factor into account. *See, e.g., City of Charlottesville v. FERC,* 774 F.2d 1205, 1212–13 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986); *American Public Transit Association v. Lewis,* 655 F.2d 1272, 1278–80 (D.C. Cir.1981); *Chae-Sik Lee v. Kennedy,* 294 F.2d 231 (D.C.Cir.), *cert. denied,* 368 U.S. 926, 82 S.Ct. 362, 7 L.Ed.2d 190 (1961); *see also SEC v. Chenery,* 332 U.S. 194, 200–01, 67 S.Ct. 1575, 1579–80, 91 L.Ed. 1995 (1947).

**14.** Whether in explaining its decision an agency has passed from the "tolerably terse to the intolerably mute," as Judge Leventhal so aptly put it in speaking for the court, *Greater Boston,* 444 F.2d at 852, depends on whether, as the Supreme Court has put it, the reviewing court can reasonably discern the path that the agency took in coming to its decision. *Bowman Transportation,* 419 U.S. at 286, 95 S.Ct. at 442. It is not a determination about the decision itself.

We do not offer the foregoing discussion of cases in the "inadequate explanation" and "failure to consider a relevant factor" categories to suggest that fees may never be awarded under EAJA if an "arbitrary and capricious" finding is based on one of these two factors. Nor should our case citations be read to indicate a view on the appropriateness of fees in those particular litigated circumstances. We merely wish to illustrate the range of problems that courts may face in their application of EAJA. We fully recognize that agency action in certain "inadequate explanation" and "failure to consider a relevant factors" cases may so obviously defy the requirements of the APA as to compel a finding that the underlying action was not "substantially justified" under EAJA. That is, an agency may not avoid fees simply by arguing that a reasonable explanation existed to justify the underlying action. To allow this would be to encourage government counsel to offer *post hoc* rationalizations, or permit the courts to search for explanations not given by the agency, in order to avoid fees under EAJA. Such an approach would be wholly inconsistent with the APA and thus hardly permissible as grounds upon which to avoid fees under EAJA.

To be sure, other reasons for invalidating agency action as "arbitrary and capricious" seem more likely than those enumerated above to signal conduct that is not "substantially justified." For example, an agency's unjustifiably disparate treatment of two similarly situated parties works a violation of the arbitrary-and-capricious standard. *See, e.g., Airmark Corp. v. FAA,* 758 F.2d 685, 691–95 (D.C.Cir.1985). So does an agency's failure to apply a rule in a situation to which the rule obviously pertains. *See, e.g., New York State Energy Research & Development Authority v. FERC,* 746 F.2d 64, 66–69 (D.C.Cir.1984). As a practical matter, the Government in fees litigation may well suffer considerably greater difficulty in demonstrating that these sorts of "arbitrary and capricious" actions are nonetheless "substantially justified."

In short, the "arbitrary and capricious" label is just that, a label or conclusion applied to a rich variety of agency conduct, including sensible but legally flawed actions as well as outrageous ones. By creating in EAJA a distinct legal standard— "substantially justified"—Congress has expressed its intent that after every sort of merits determination, including a determination that agency action descended to the depths of "arbitrary and capricious" conduct, the court entertaining an EAJA application is obliged to reexamine the facts under a different legal standard to determine whether that conduct is slightly more than reasonable. Mechanical jurisprudence will not do. We are called upon by Congress to act as judges by exercising judgment in these matters, not blithely reach for easy answers suggested by evocative labels.

In light of this unequivocal statutory indication of Congressional intent, we obviously need not repair to the legislative history to inform our analysis. *See Maine v. Thiboutot,* 448 U.S. 1, 6 n. 4, 100 S.Ct. 2502, 2505 n. 4, 65 L.Ed.2d 555 (1980). Consistent with what we take to be the Supreme Court's customary method (as opposed to its *Thiboutot*-type pronouncements) in such instances, however, we pause to note that the legislative history in this case both confirms our interpretation and at the same time illustrates why the Supreme Court has warned courts that "going behind the plain language of a statute ... is a step to be taken cautiously even under the best of circumstances." *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). For our expedition into the jungle of legislative history shows that one of the specimens the parties have captured and closely examined has the markings of a rogue elephant.

Specifically, the House Report accompanying the bill that was ultimately enacted as the EAJA Amendments, H.R. 2378, 99th Cong., 1st Sess. (1985), contains, without analysis, the offhand generalization that "[a]gency action found to be arbitrary and capricious or unsupported by substantial

evidence is virtually certain not to have been substantially justified under the Act." H.R.Rep. No. 120, *supra* note 12, at 9–10, *reprinted in* 1985 U.S.Code Cong. & Ad. News at 138. This appears, in retrospect, to have been uninformed *ipse dixit.* It is also, upon further analysis, what appears to be spurious legislative history, as evidenced by renunciations of this precise statement in both Houses. On the floor of Congress, both Senate and certain House sponsors of the EAJA Amendments expressly repudiated this apparently staff-produced bit of "history." For example, Senator Grassley, cosponsor of the Senate companion bill to H.R. 2378, responded as follows when asked whether the House Report passage quoted above correctly reflected Congress' intent:

I want to make it clear that the EAJA case over the fees issue is a separate and distinct inquiry. Just because an agency loses on the merits of the case doesn't mean that it is automatically going to be liable for a fee award. The EAJA does not provide for automatic fee shifting.

131 Cong.Rec. S9993 (daily ed. July 24, 1985). Senator Thurmond, Chairman of the Senate Judiciary Committee, echoed these remarks. *See id.* So, too, did members of the House.[15]

This explicit rejection of the language of the House Report fittingly illustrates why "deference to the supremacy of the legislature, as well as recognition that Congressmen typically vote on the language of a *bill*" rather that on reports that accompany it, demands that courts ordinarily con-

fine themselves to the language of the statute. *Locke,* 105 S.Ct. at 1793 (emphasis added); *see also International Brotherhood of Teamsters v. Interstate Commerce Commission,* 801 F.2d 1423, 1426 (D.C.Cir.1986). It also illustrates what our colleague, now-Justice Scalia, aptly described as the increasing danger of "converting a system of judicial construction into a system of committee-staff prescription." *Hirschey v. FERC,* 777 F.2d 1, 8 (D.C.Cir.1985) (Scalia, J., concurring). We observe as well that this court sitting *en banc* has condemned the well-recognized phenomenon of deliberate manipulation of legislative history at the committee level to achieve what likely cannot be won before Congress as a whole. *See Jordan v. Department of Justice,* 591 F.2d 753, 767–71 (D.C.Cir.1978) *(en banc); see also Vaughn v. Rosen,* 523 F.2d 1136, 1142–43 (D.C.Cir. 1975).

In sum, a court in ruling on an EAJA application must determine whether the Government's "position" is "substantially justified." This necessarily requires the court to examine through an EAJA prism both the Government's litigation position and the conduct that led to litigation. After doing so, the court must then reach a judgment independent from that of the merits phase. The judgment is whether the Government's actions were slightly more than reasonable. *See* 28 U.S.C. § 2412(d)(2)(D).[16]

### III

We now examine the District Court's judgment in light of the principles

---

**15.** Two Members of the House specifically rejected the passage of the House Report quoted in the text. Their criticism focused on the implication in this passage that a finding that agency action was not supported by "substantial evidence" inevitably led to finding the action not "substantially justified." Representative Kindness of the House Judiciary Committee, a cosponsor of the bill that was ultimately enacted as the EAJA Amendments, condemned the Report's discussion of the "substantially justified" standard as "mislead[ing]" and as "gratuitously authoritarian." *See* 131 Cong.Rec. H4763 (daily ed. June 24, 1985) (statement of Rep. Kindness); Representative Moorhead, another cosponsor, concurred in this repudiation. *See id.* And

Representative Kastenmeier likewise agreed that "[s]ubstantial justification is a different standard than the substantial evidence standard." *Id.* In the face of this onslaught, no voice was raised in defense of the Report's interpretation.

**16.** In light of our conclusion, *infra* section III.D, we need not address the situation in which only part of the Government's litigation position is substantially justified. *Cf. Cinciarelli v. Reagan,* 729 F.2d 801 (D.C.Cir.1984) (awarding fees incurred in combatting that portion of Government's position that was not substantially justified).

just described. At the outset, we emphasize that the material facts of this case are undisputed. The District Court's order involved only the determination of governing legal standards and application of these standards. We therefore conduct, consistent with *Spencer's* commands, a *de novo* review. *See Spencer*, 712 F.2d at 562–64. After doing so, we are constrained to conclude that, while the District Court stated the correct legal standards, it fell into error in applying those standards.

We observe preliminarily that although the EAJA Amendments were not in place at the time of its decision, the District Court in fact considered not only the Government's litigation position but also the conduct that led to the litigation, consistent with the definition of "position of the United States" added in the 1985 Amendments. The trial court's prescience is explained in part by its sound reliance on our observation in *Spencer* that "the governmental action that precipitates the controversy almost invariably *is* its litigation position." 712 F.2d at 551 (emphasis in original). The District Court also correctly recognized that under *Spencer*, the governing standard is "slightly more stringent than one of reasonableness." *Id.* at 558.

That being said, we part company with the District Court's application of the standard to the undisputed facts. We are convinced that the FEC's handling of Congressman Rose's administrative complaint was "substantially justified." Far from suggesting unjustifiable delay, the record demonstrates prompt and sustained agency attention to Rep. Rose's complaint and thorough consideration of the issues it raised. To recap briefly, the Commission acted on the complaint immediately upon receiving it in October 1982 by notifying respondents and soliciting their responses. The FEC then turned to the task of evaluating this material. Because the complaint raised novel and complex issues, over the next six months the Commission not only had to decide what factual disputes existed, but in addition, assuming the facts were as

Rep. Rose alleged, whether they constituted violations of the Campaign Act. At the same time, needless to say, the Commission was receiving other complaints demanding immediate attention, some of which may have been deemed by the agency more urgent and important than Rep. Rose's complaint.

Within weeks after its threshold determination in early May 1983 that "reason to believe" existed, the Commission began its investigation, drafting numerous interrogatories and approving subpoenas. Then followed prolonged resistance by respondents, rebuffed attempts by the FEC informally to gain the information sought from JMI and NCC, and, in February of the next year, resort to federal court to overcome respondents' gritty intransigence. All the while, of course, the Commission's resources were directed to other complaints as well. Like the federal courts, the FEC appears to have more than one case on its docket. And at the same time that the FEC was seeking through court action to obtain information from respondents, the Commission was defending these same efforts against Mr. Rose's lawsuit in Washington, D.C.

The Congressman does not dispute this. Instead, he argues in general terms that most investigations take less time than this one and that the FEC should have directed more energy to his complaint (and, implicitly, less to others). In the absence of evidence of an abuse of discretion, we decline this invitation to second-guess the Commission's exercise of its discretion. *See National Right to Work Committee v. FEC*, 2 Fed.Elec.Camp.Fin.Guide (CCH) ¶ 9225, at 51,774–75 (D.D.C.1984); *Common Cause*, 489 F.Supp. at 743–44. It is not for the judiciary to ride roughshod over agency procedures or sit as a board of superintendance directing where limited agency resources will be devoted. We are not here to run the agencies. The Commission has, in our view, amply justified its handling of the complaint.[17]

---

17. Examination of the FEC's conduct under the     *TRAC* factors for determining unreasonable

We reach the same conclusion about the FEC's litigation position. The Commission, in truth, had no practical alternative to defending against Rep. Rose's action. It cannot be forgotten that the Congressman was advancing interpretations of the Campaign Act that would have drastically altered the agency's operations. And the arguments were dead wrong. Mr. Rose, it will be recalled, contended that the Campaign Act required the Commission to act within 120 days or within an election cycle. We unequivocally rejected both contentions. The FEC's contrary argument—that the Commission's handling of a complaint should be judged under the deferential standards of review prescribed in the APA—was not only substantially justified; it was entirely *correct,* as we held in our summary reversal of the District Court in the first instance. *Rose v. FEC,* No. 84–5701 (D.C.Cir. Order Dated Oct. 24, 1984), J.A. at 90. Notwithstanding the exacting standards requiring appellate restraint in effecting a summary reversal, *see, e.g., Sills v. Bureau of Prisons,* 761 F.2d 792, 793 (D.C.Cir.1985); *United States v. Glover,* 731 F.2d 41, 42 (D.C.Cir.1984) (per curiam); *Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.) (per curiam), *cert. de-*

*nied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980), we did not hesitate in finding absolutely no basis in law for Mr. Rose's creative reading of FECA. Then, after remand, the FEC properly renewed its arguments that it acted reasonably in handling Rose's complaint. As our analysis above shows, we believe that the agency's arguments had substantial merit and were plainly sufficient to satisfy EAJA's "substantially justified" standard.[18] We are therefore constrained once again to reverse the judgment below and remand the case with instructions to dismiss the application.

*Reversed.*

agency delay reinforces our conclusion. *See TRAC,* 750 F.2d at 80 (listing factors). First, the fact that the investigation took approximately two years does not, standing alone, violate a rule of reason. In *Common Cause,* for example, a two-year delay between the filing of a complaint with the FEC and its conclusion of conciliation agreements was not found contrary to law. 489 F.Supp. at 740. Second, when we look to the Campaign Act itself to inform a rule of reason, we see that the Commission acted within all of the time limits specified in that statute. *See* 2 U.S.C. § 437g. Third, notwithstanding the obvious importance of the political process, this is not a case in which human health and welfare are at stake, and in which agency delay is least tolerable. Fourth, a judicial order in 1984, when the District Court ruled on the merits, may well have adversely affected the FEC's ability to attend to "activities of a higher or competing priority," not the least of which was the Presidential election of that year. And finally, although Mr. Rose now claims that he was significantly prejudiced by the delay, it is difficult to credit his claim in light of his voluntary dismissal of an earlier action against the FEC filed in June 1983. We also cannot

help but observe the fact that the Congressman was returned to Washington, D.C. by his constituency in both 1982 and 1984. *See* United States Congress, Joint Commission on Printing, *1985–1986 Official Congressional Directory: 99th Congress* 146 (1985). Thus, Congressman Rose is still Congressman Rose. In sum, when we examine the FEC's processing of Mr. Rose's administrative complaint under the *TRAC* factors for determining whether agency delay is "arbitrary and capricious," we conclude that the Commission amply met its burden of proving that its conduct was "substantially justified."

**18.** The District Court speculated that the FEC's defense against Rep. Rose's action compounded the delay. *Rose v. FEC,* No. 84–2278, at 6–7 (D.D.C. Memorandum Opinion & Order dated May 24, 1985), J.A. at 210–11. For the reasons already stated, this speculation cannot stand; moreover, we cannot help but observe that the court below failed to assess how the delay caused by its ill-fated adjudication of Rep. Rose's first motion for summary judgment contributed to what it viewed as the unacceptably long delay overall.