*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CV-0504

CAPITOL PARK IV CONDOMINIUM ASSOCIATION, INC., APPELLANT,

V.

DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CA-000878-B)

(Hon. Danya A. Dayson, Trial Judge)

(Argued May 29, 2025     Decided September 18, 2025)

*Brian R. Fellner* for appellant.

*Emil Hirsch* for appellee.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellant Capitol Park IV Condominium Association, Inc. (Capitol Park) sued appellee the District of Columbia Water and Sewer Authority (D.C. Water), challenging the way in which D.C. Water calculates a portion of Capitol Park's water bill. The trial court granted summary judgment to

D.C. Water. We affirm in part, vacate in part, and remand the case for further proceedings.

## I. Factual and Procedural Background

## A. Statutory Background

D.C. Water is required by statute "to plan, design, construct, operate, maintain, regulate, finance, repair, modernize, and improve water distribution and sewage collection, treatment, and disposal systems and services, and to encourage conservation." D.C. Code § 34-2202.02(c). D.C. Water has the authority "[t]o make, adopt, and alter . . . regulations for the administration and regulation of its business and affairs" and "[t]o establish, adjust, levy, collect, and abate charges for services, facilities, or commodities furnished or supplied by it." *Id.* § 34-2202.03(3), (11).

In 2005, a consent decree required D.C. Water to develop a long-term plan to reduce stormwater overflow into the Anacostia River. *See* Report on Bill No. 17-0935 before the Committee on Public Works and the Environment, Council of the District of Columbia at 2-3 (Nov. 21, 2008). To cover the costs of implementing the plan, the D.C. Council authorized D.C. Water "to determine sanitary sewer service charges to include a charge for the amount of impervious surface area on [a]

customer's property." *Id.* at 3; *see also* D.C. Code § 34-2202.16(c-1)(1)(A) ("[D.C. Water] shall assess an impervious area charge on any property in the District . . . ."); CRIAC Clarification Temporary Amendment Act of 2024, D.C. Law 25-285, § 3, 71 D.C. Reg. 14108 (2024) (temporarily adding Subsection (c-1)(1) to Section 34-2202.16). An impervious surface "either prevents or retards the entry of water into the ground as occurring under natural conditions, or [] causes water to run off the surface in greater quantities or at an increased rate of flow, relative to the flow present under natural conditions." D.C. Code § 34-2202.16(c-1)(1)(A). "[T]he term 'surface' includes rooftops, footprints of patios, driveways, private streets, other paved areas, athletic courts and swimming pools, and any path or walkway that is covered by impervious material." *Id.* § 34-2202.16(c-1)(1)(B).

The impervious-surface charge is referred to as the Clean Rivers Impervious Area Charge (CRIAC). The CRIAC must be assessed "based on a billing methodology that takes into account the amount of impervious surface on a property." D.C. Code § 34-2202.16(c-1)(1)(A).

D.C. Water assesses the CRIAC based on the Equivalent Residential Unit (ERU) of each property, which "is defined as [1,000] square feet . . . of impervious surface area, taking account of a statistical median of residential properties." 21 D.C.M.R. § 4101.4. D.C. Water has divided its customers into three categories to

calculate each customer's ERU: residential, multi-family, and nonresidential. *Id.*

§ 4104.1. A residential customer is defined as

> a customer whose premises is a single-family dwelling
> unit used for domestic purposes, whether as a row,
> detached or semi-detached structure, or as a single
> dwelling unit within an apartment building, or as a single
> dwelling unit within a condominium, or as a single
> dwelling unit within a cooperative housing association,
> *where each unit is served by a separate service line and is*
> *individually metered* and used for domestic purposes; or a
> multi-family structure or development of less than four (4)
> single-family, apartment, condominium, or cooperative
> housing association dwelling units where all the units are
> used for domestic purposes and *served by a single service*
> *line that is master metered*; excluding a premises operated
> as a nursing home, dormitory or transient housing
> business, including, but not limited to a bed and breakfast,
> hotel, motel, inn, boarding house or rooming house.

*Id.* § 4104.1(a) (emphasis added). A multi-family customer is defined as

> a customer whose premises is a multi-family structure or
> development (such as an apartment, condominium, or
> cooperative housing association) used for domestic
> purposes, with four or more single-family, apartment,
> condominium, or cooperative housing association
> residential dwelling units *served by the same service line*
> *that is master metered*; excluding a premises operated as a
> nursing home, dormitory or transient housing business,
> including, but not limited to a bed and breakfast, hotel,
> motel, inn, boarding house or rooming house.

*Id.* § 4104.1(b) (emphasis added). Nonresidential customers are all other customers

that do not fall within the residential or multi-family categories. *Id.* § 4104.1(c).

5

Residential customers are assessed a CRIAC based on a system that divides customers into six tiers based on the square footage of the impervious area on the property at issue. 21 D.C.M.R. § 4101.5. Each tier is assigned an ERU, which is then used to calculate the amount of the CRIAC. *Id.* That ERU does not precisely correspond to the square footage of the impervious area. *Id.* For example, a residential customer with 1,800 square feet of impervious area would be placed in Tier 2 and would be assigned an ERU of 1.0, even though an ERU is defined as 1,000 square feet of impervious area. *Id.*; *id.* § 4104.1. In contrast, the ERUs for multi-family and nonresidential customers are "based upon the total amount of impervious surface area on each lot." *Id.* § 4101.6. There is no tier system for multi-family and nonresidential customers.

## B. Factual Background

The following facts appear to be undisputed, except as indicated. Capitol Park is an association that owns and operates a condominium complex located in Southwest D.C. The complex spans over fifty acres and includes over 200 individually owned townhomes that are separated into blocks of four to five units and surrounded by courtyards, playgrounds, and parking lots.

Although each townhome in the complex is owned separately, water comes into the complex through several service lines that each have their own meter. D.C.

Water issues several separate water bills to Capitol Park, and Capitol Park pays the bills but collects monthly dues from townhome owners to recover the cost of the bills. Capitol Park explored individually metering each townhome's water supply, but doing that would have cost Capitol Park between $10 million and $20 million, which Capitol Park could not afford.

Because Capitol Park is "a customer whose premises is a multi-family . . . development . . . used for domestic purposes, with four or more . . . condominium . . . units served by the same service line that is master metered," 21 D.C.M.R. § 4104.1(b), Capitol Park is classified as a multi-family customer to calculate its CRIAC. Capitol Park is thus assessed a CRIAC "based upon the total amount of impervious surface area on each lot." *Id*. § 4101.6. If the townhomes each had a separate individually metered service line from D.C. Water, at least some of the properties on the complex could be classified as residential, and those properties could be billed under the different approach applicable to residential properties. According to Capitol Park, the CRIAC charge for the complex would have been reduced by over $200,000 under the latter approach.

## C. Procedural Background

Capitol Park's complaint alleges that D.C. Water's classification of Capitol Park as a multi-family customer is arbitrary and capricious because that

classification turns on how the water supply to the property was metered. The complaint also alleges that D.C. Water violated Capitol Park's due-process rights because Capitol Park was not afforded an opportunity to properly challenge its classification as a multi-family customer. Capitol Park sought a declaratory judgment, damages, and a permanent injunction requiring D.C. Water to classify Capitol Park as a residential customer.

Capitol Park and D.C. Water both moved for summary judgment. In support of its motion, Capitol Park attached a committee report published as the D.C. Council was considering the Water and Sewer Authority Equitable Ratemaking Amendment Act of 2008, which was later codified as D.C. Code § 34-2107. *See* Report on Bill No. 17-0935 before the Committee on Public Works and the Environment, Council of the District of Columbia (Nov. 21, 2008). The report contained hearing testimony from D.C. Water's Chairman of the Board, Robin B. Martin, which described the purpose of the CRIAC and how D.C. Water would develop the CRIAC rate structure. Report on Bill No. 17-0935 before the Committee on Public Works and the Environment, Council of the District of Columbia, Statement of Robin B. Martin, Chairman of the Board at 2-4 (Nov. 21, 2008). Mr. Martin testified that "the stormwater that causes combined sewer overflows has nothing to do with the volume of sanitary wastewater that comes from a property." *Id.* at 2. Mr. Martin further emphasized that "wet weather run-off is not directly

related to the sanitary wastewater produced by a customer. In fact, high volumes of run-off are produced by property owners that do not have a metered connection to the District water and sewer infrastructure." *Id.* at 3. Accordingly, the new rate structure for the CRIAC was being developed "to separate the traditional volumetric sewer charges from the cost of dealing with the wet weather runoff that produces [combined sewer overflows]." *Id.* at 2. Mr. Martin testified that, as a part of developing the rate structure, D.C. Water researched other municipalities across the country, including Philadelphia, Denver, and Louisville. *Id.* at 3. D.C. Water "also found that impervious surface area is a well-established and accepted methodology, used in a number of jurisdictions. ERUs are also a common measure of surface area . . . ." *Id.* at 4.

The committee report also contained testimony from Jerry N. Johnson, D.C. Water's General Manager. Report on Bill No. 17-0935 before the Committee on Public Works and the Environment, Council of the District of Columbia, Statement of Jerry N. Johnson, General Manager (Nov. 21, 2008). Mr. Johnson testified that "property owners with more impervious area contribute more to the runoff that reaches the combined sewer system," which "is why communities around the country have begun to implement programs to recover costs using a measure of impervious surface area to develop an 'Impervious Surface Area Charge.'" *Id.* at 4 (emphasis omitted).

In support of its motion for summary judgment, D.C. Water submitted a declaration from Olu Adebo, who had previously served as the Chief Financial Officer of D.C. Water. Mr. Adebo explained that, to calculate each customer's ERU, each parcel's impervious area is measured. Consistent with the regulations, residential customers are placed into tiers based on the measured impervious area and assigned an ERU based on their tier placement. Multi-family and nonresidential customers' ERUs are determined based on the measured impervious area. This rate structure "aligns with industry standards that were duly considered by [D.C.] Water in applying the regulations" and "is common practice." Single-family residential rate classes have a simplified rate structure such as the one used by D.C. Water because "[p]arcels in the single-family residential rate class are often substantially similar in size, characteristics, and impervious area, while characteristics of the non-single family residential rate class can vary considerably." Additionally, "[t]he use of number of dwelling units is commonly used to determine whether multi-family properties should be classified and billed consistent with the nonresidential rate class."

Mr. Adebo concluded that "Capitol Park's request to be classified as residential would be a violation of the regulations and would defeat water billing, including CRIAC." One stated reason for that conclusion was that "[i]n the event of non-payment for CRIAC, [D.C.] Water may turn the water off at the meter and/or

place a lien against the property for unpaid water bills, including CRIAC, among other remedies." Mr. Adebo also identified measures that Capitol Park could take to reduce its CRIAC, including separating service lines and installing individual meters.

The trial court granted summary judgment to D.C. Water. Relying on Mr. Adebo's declaration, the trial court concluded that D.C. Water's decision to bill residential customers using a different rate structure from that used for multi-family and nonresidential customers was reasonable "because of substantial similarities in the single-family residential rate class and the lack of similarity as a subject property grows in size" (internal quotation marks omitted). According to the trial court, the D.C. Council committee report discussed above supported the reasonableness of this decision, and the comments from Mr. Martin confirmed that D.C. Water's methodology was used in other jurisdictions. Further, the trial court stated that Capitol Park had not pointed to any record evidence to show that D.C. Water acted arbitrarily, capriciously, plainly erroneously, or inconsistently with the enabling statute or to dispute that D.C. Water's methodology was consistent with industry standards.

For those reasons, the trial court granted summary judgment to D.C. Water with respect to Capitol Park's claim that D.C. Water's classification of Capitol Park as a multi-family customer was arbitrary and capricious.

The trial court also granted summary judgment with respect to Capitol Park's due-process claim. Because Capitol Park does not challenge the trial court's due-process ruling in this court, we do not further discuss that claim. *See, e.g.*, *In re Shearin*, 764 A.2d 774, 778 (D.C. 2000) ("Points not urged in a party's initial brief are treated as abandoned.").

Finally, the trial court interpreted the complaint as raising a separate equal-protection challenge, as to which the trial court also granted summary judgment to D.C. Water. Capitol Park does not raise a separate equal-protection claim on appeal, however, and we therefore do not address that issue.

## II. Analysis

We affirm the trial court's grant of summary judgment to D.C. Water with respect to the constitutional claims that are not contested in this court. We vacate the trial court's ruling that D.C. Water was entitled to summary judgment with respect to Capitol Park's claim that D.C. Water's classification of Capitol Park as a

multi-family customer was arbitrary and capricious, and we remand the case for further proceedings.

At the outset, the parties disagree on the applicable standard of review. Capitol Park argues that our review is de novo, whereas D.C. Water argues that our review is highly deferential. We need not resolve that disagreement, because we assume without deciding that D.C. Water is entitled to substantial deference with respect to the way it has implemented the CRIAC in the challenged regulation. *See, e.g.*, *Lloyd's Window Prods. Co. v. D.C. Minority Bus. Opportunity Comm'n*, 585 A.2d 1323, 1324 (D.C. 1990) ("Regulations promulgated pursuant to a statute are valid unless they are arbitrary, capricious, or manifestly contrary to the statute."). Even on that assumption, however, this court may not uphold a challenged regulation if the agency that promulgated the regulation has failed to provide an adequate explanation for the agency's decision. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. That requirement is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned. But where the agency has

failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.") (citation modified).

As we understand it, Capitol Park's argument in substance is as follows: (1) D.C. Water assesses the CRIAC for multi-family customers based on an actual measurement of the impervious surface on their property; (2) for residential customers, D.C. Water instead uses a tier system that means the CRIAC for any given residential customer may be less (or more) than the CRIAC would have been if it were based directly on a measure of the impervious surface on the property; (3) if Capitol Park metered the water-service lines differently, at least some of the area on the complex would be classified as residential; (4) that change in classification would substantially reduce Capitol Park's overall CRIAC; (5) the CRIAC is intended to reflect the stormwater runoff from a given property; (6) how the water lines are metered has nothing to do with the amount of stormwater runoff from a property; and (7) it is therefore arbitrary and capricious for D.C. Water to tie the amount of the CRIAC to how the water-supply lines are metered.

We agree with Capitol Park's argument to the following extent: Barring some adequate explanation by D.C. Water for tying the CRIAC charge to metering, the regulation seems arbitrary and capricious. D.C. Water is directed by statute to set CRIAC charges using "a billing methodology that takes into account the amount of

impervious surface on a property." D.C. Code § 34-2202.16(c-1)(1)(A). We take as a given for current purposes that D.C. Water would have quite a bit of flexibility in determining how to create a CRIAC billing system that adequately "takes into account the amount of impervious surface" on each property. *Id.*; *see generally, e.g.*, *Washington Pub. Int. Org. v. Pub. Serv. Comm'n*, 393 A.2d 71, 81 (D.C. 1978) (noting that courts "grant[] considerable deference to the expertise of a regulatory commission in arriving at a proper ratemaking judgment"). In the absence of some further explanation, however, it does not seem reasonable for D.C. Water to establish a system of CRIAC charges that makes the amount of the CRIAC charge depend on the way in which water-service lines are metered, given that it is undisputed that the manner of metering bears no direct logical relation to the amount of impervious surface area on a property.

Although D.C. Water has attempted to provide some explanation of the approach to the CRIAC reflected in the regulation, we view that explanation as insufficient. Much of what D.C. Water relies upon is simply general information about the reasons for the CRIAC charge and the basic approach taken to calculate that charge under the regulation, such as dividing customers into classes and generally tying the amount of the CRIAC to the impervious surface area on a given property. That general information, however, does not provide an explanation for the specific aspect of the regulation that Capitol Park is challenging.

Somewhat more specifically, D.C. Water points to the statement in Mr. Adebo's declaration that D.C. Water's "CRIAC rate structure aligns with industry standards." We do not view that general statement as adequately explaining D.C. Water's focus on metering as a sometimes-dispositive consideration in classifying customers for purposes of the CRIAC. Mr. Adebo's deposition goes on to explain why different rate classes are used and to state that the number of dwelling units is commonly used to differentiate between rate classes. Those general explanations do not shed light on whether the use of metering as a key consideration is or is not reasonable.

Mr. Adebo's declaration does briefly discuss metering more specifically at two points. First, the declaration seems to indicate that larger multi-unit properties that are master metered typically have one customer, such as a homeowner association, that is charged for the CRIAC at a nonresidential rate and that then can pass that charge along to individual unit owners. It appears to be undisputed, however, that this typical arrangement is not required, because Mr. Adebo's declaration acknowledged that Capitol Park could permissibly have caused the townhomes on the property to be classified as residential simply by individually metering the water-service lines to the townhomes.

Second, Mr. Adebo's declaration suggests somewhat unclearly that requiring separate meters makes it easier for D.C. Water to respond if a customer fails to pay a water bill. It is difficult to see how that general idea would be applicable in the present context, where Capitol Park is the sole customer and is simply seeking to have the townhomes treated as residential for purposes of the CRIAC.

In granting summary judgment to D.C. Water, the trial court also relied on Mr. Martin's testimony in the committee report stating that, as a part of developing the rate structure, D.C. Water researched other municipalities. Mr. Martin's testimony provided no details, however, about the rate structures in those municipalities, each municipality's originating statute and regulations, and whether metering is a factor in the municipalities' classification criteria.

The trial court also stated that Capitol Park had not "pointed to any record evidence to dispute [D.C. Water's] allegations regarding the chosen methodology's acceptance as an industry standard or that the agency acted arbitrarily and capriciously in formulating the basis for its classification structure." D.C. Water makes a similar argument in this court. We are not persuaded by this point.

We first flag a question that the parties somewhat unclearly dispute but that we do not fully resolve: To what extent does Capitol Park's challenge raise issues of fact, as to which Capitol Park might have a factual burden of proof, and to what

extent does Capitol Park's challenge raise issues of law? Whatever the full answer to that broad question may be, we conclude that Capitol Park presented sufficient support in the trial court for the argument that D.C. Water had failed to provide an adequate explanation for considering metering as part of the CRIAC billing methodology. Specifically, Capitol Park pointed out that metering did not appear to be relevant to the purpose of CRIAC charges and presented legislative-history materials supporting that argument. We see no basis for concluding that Capitol Park was required to do more than that.

Finally, D.C. Water argues that metering is just one of several factors considered under the CRIAC regulations in determining the CRIAC for various customers. *See* 21 D.C.M.R. § 4104.1 (factors that distinguish residential, multi-family, and nonresidential customers include (1) the type of property, (2) the purpose of the property, (3) the number of units on the property, and (4) how the property is metered). That is true, but sometimes, as in the present case, metering can be a dispositive factor. If that factor is arbitrary, the agency's overall determination based on that factor can be arbitrary even if other of the applicable factors are not arbitrary.

For the foregoing reasons, we hold that D.C. Water has not provided a sufficient explanation to show that there is a rational connection between metering

and the CRIAC.  It follows that the trial court erred in granting summary judgment to D.C. Water with respect to Capitol Park's contention that D.C. Water's consideration of metering in determining CRIAC rates was arbitrary and capricious. *Cf. generally, e.g.*, *Fed. Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986) ("For example, an agency action accompanied by an inadequate explanation constitutes arbitrary and capricious conduct.").

Capitol Park asks this court not only to vacate the trial court's order granting summary judgment to D.C. Water but also to hold that the trial court should have granted Capitol Park's motion for summary judgment in its favor.  We decline to take that further step.  Because the trial court ruled for D.C. Water, the trial court did not address a number of potential issues that would have to be resolved before any judgment could be entered in favor of Capitol Park.  To take just one example, it is not at all clear what remedy should follow from the conclusion that D.C. Water failed in the trial court to adequately explain the basis for considering metering in determining CRIAC charges.  We leave such issues to be decided in the first instance by the trial court.  *See, e.g.*, *Stancil v. First Mount Vernon Indus. Loan Ass'n*, 131 A.3d 867, 874 (D.C. 2014) (issue that trial court did not address was "best left for the trial court in the first instance on remand").

For the foregoing reasons, we affirm the trial court's grant of summary judgment to D.C. Water on Capitol Park's constitutional claims, vacate the grant of summary judgment to D.C. Water on Capitol Park's claim that D.C. Water acted arbitrarily and capriciously in considering metering in determining the CRIAC charge, and remand the case for further proceedings.

*So ordered.*