**LEEWARD AUTO WRECKERS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 87–1196.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1988.

Decided March 11, 1988.

Jared H. Jossem, with whom Perry W. Confalone, Honolulu, Hawaii, was on the brief, for petitioner.

Diane Rosse, Atty., N.L.R.B., with whom Margery E. Lieber, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., was on the brief, for respondent.

Before WALD, Chief Judge, STARR and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is an attorneys' fees case arising under the Equal Access to Justice Act. The question is whether substantial evidence supports the decision of the National Labor Relations Board denying the fee application filed by Leeward Auto Wreckers, Inc. For reasons to be set forth, we conclude that part of the Board's decision falls short of the congressionally mandated standard.

I

Leeward is a family-owned corporation engaged in the automobile salvage business in Hawaii. The company hauls wrecked automobiles to its yard, where it reduces the remains of once proud automobiles to humble bales of scrap steel. Leeward sells its final product to Hawaiian Western Steel, Ltd., which converts the bales into reinforcement bars for concrete.

Beginning in 1981, Leeward's economic fortunes began to sag. Hawaiian Western markedly decreased its purchases of scrap steel, causing Leeward to suffer severe cash flow problems. Finding itself unable to meet its payroll, Leeward temporarily laid off all its employees effective May 1, 1981.[1] Sakae Fujimoto, Leeward's president, failed to provide notice of the impending layoff to the appropriate union officials; Fujimoto did, however, inform the union steward of the forthcoming action. Fujimoto also informed the Union, through a May 3, 1982 letter to the president of the Union's Hawaiian affiliate, of his decision to make the layoffs permanent. Through Leeward's labor relations consultant, one Michael McGuire, Fujimoto reiterated this intention at a May 25 meeting with a union representative. In response to the representative's inquiry, consultant McGuire indicated that Leeward would consider bringing some employees back if the Union would reduce its wage demands; the union representative, however, never pursued the invitation.

Leeward continued to carry on business after the layoff, relying on its remaining non-union staff and subcontracts with other individuals. In mid-June 1982, several non-bargaining unit employees performed work previously handled by unit employees. Although these employees worked sporadically throughout the summer, none were paid for their labors. In this same time frame, Fujimoto also prepared a draft agreement under which an independent company would provide hauling services. Although the agreement was never executed, Leeward did pay the trucking firm on a piece rate basis to haul automobiles to its yard.

In October 1982, the Union reacted to the foregoing actions by filing a charge with the National Labor Relations Board, alleging that Leeward had engaged (and was engaging) in unfair labor practices under the National Labor Relations Act. 29 U.S.C. § 151 et seq. (1982). On the date of filing, the Labor Board sent Leeward a copy of the unfair labor practice charge. In its transmittal letter, the Board requested Leeward to "submit promptly a complete written account of the facts and a statement of [the company's] position in respect to the allegations set forth in the charge." Brief for Respondent, Supplemental Appendix at 7. From the record, it appears that Leeward never responded to this request.[2]

---

1. Leeward's union employees are represented by the United Steelworkers of America, AFL–CIO, CLC (the Union). Leeward and the Union have been party to a series of collective bargaining agreements since 1965. The most recent agreement, effective from February 1982 to February 1985, covers all Leeward employees except "office workers, supervisory personnel, security guards, salesmen, inspectors, and laboratory personnel." *Leeward Auto Wreckers, Inc.*, No. 37–CA–1969, mem. op. at 2 (ALJ Nov. 10, 1983), Joint Appendix (J.A.) at 75 (hereinafter "ALJ Decision"). During the relevant period, Leeward employed approximately 14 employees who fell within the coverage of the bargaining agreement.

2. The General Counsel asserts that Leeward failed to respond to the Regional Office's letter. Brief for Respondent at 10. Leeward counters that "[t]his representation is completely without record support." Reply Brief for Petitioner at 2. Although Leeward is correct in asserting that no evidence of its failure to respond appears in the record, neither is there any evidence of its having responded. Presumably, if the company *had* responded it would have said so.

The NLRB afforded Leeward a second opportunity to respond to the charge in late January 1983. The NLRB attorney assigned to investigate the charge, Thomas Cestare, arranged an interview with Fujimoto and labor consultant McGuire. During the interview, Fujimoto furnished Cestare an affidavit responding to one (minor) allegation. McGuire recounted for Cestare's benefit the company's position regarding the remaining (more important) allegations; McGuire did not, however, provide any evidence of possible defenses to the allegations, nor did he respond to Cestare's suggestion that he submit a written statement of the company's position.

A week after the interview, the NLRB's General Counsel issued a complaint charging Leeward with violating sections 8(a)(5) and (a)(1) of the Act. 29 U.S.C. § 158(a)(5), (1) (1982). Specifically, the complaint alleged that Leeward engaged in the following unfair labor practices: (1) laying off bargaining unit employees without prior notice to or bargaining with the Union; (2) unilaterally transferring bargaining unit work to nonunit employees; (3) subcontracting out bargaining unit work, again without notifying the Union or giving it an opportunity to bargain; and (4) by-passing the Union and dealing directly with an employee concerning the terms and conditions of employment. *Leeward Auto Wreckers, Inc.*, Complaint and Notice of Hearing, No. 37–CA–1969, J.A. at 11–12.

A hearing on these allegations was scheduled for July 12, 1983. On the morning the hearing was to begin, counsel for Leeward became aware that the company enjoyed what appeared to be an incontrovertible defense to the unilateral subcontracting allegation. Leeward, it turned out, had a long history of subcontracting out unit work all along. Apparently, the Union was not only aware of this practice,[3] but during collective bargaining negotiations in 1982 had unsuccessfully attempted to restrict it. Coupled with the company's apparent financial predicament, this longstanding practice provided Leeward with a sure defense under the Board's decision in *Westinghouse Electric Corp.*, 150 N.L.R.B. 1574 (1965).[4] Leeward's attorney immediately attempted to apprise the General Counsel's representatives of the existence of this defense, approaching both the Board's trial attorney and investigator Cestare armed with cancelled checks demonstrating Leeward's past practice of subcontracting. J.A. at 280–82. Unreceptive to Leeward's eleventh-hour importunings, the General Counsel's representatives chose not to reconsider their position and to press forward with the case.

Settlement negotiations having thus failed, the hearing proceeded apace. At its conclusion Leeward moved for dismissal. The ALJ denied the motion, however, and instructed the parties to file post-argument briefs. Some months later, the ALJ issued his decision, ruling in favor of Leeward on three of the four allegations and sustaining only the (minor) direct dealing charge.[5]

---

3. The company's counsel discovered, and testimony at the hearing confirmed, that Leeward had in fact subcontracted for hauling services with, of all people, its own union employees. Indeed, two of the union employee-subcontractors sat on the United Steelworkers' negotiating committee. Letter from Jared Jossem to Walter Kintz, Regional Director NLRB 2 (July 21, 1983), Appendix Exhibits No. 2.

4. The Board in *Westinghouse* held that an employer's failure to notify and bargain with a union over a decision to subcontract out bargaining unit work (or to assign such work to nonunit employees) does not violate federal labor law if the employer can demonstrate that its decision (1) was motivated solely by economic considerations, (2) comported with its customary business operations, (3) did not vary significantly in kind or degree from an established past practice, (4) had no demonstrable adverse impact on unit employees, and (5) was preceded by the union's having an opportunity to bargain over the decision. 150 N.L.R.B. at 1577.

5. The ALJ found that the company president, Fujimoto, unlawfully bypassed the Union by bargaining directly with a union employee over wages and benefits. ALJ Decision at 9, J.A. at 82. Leeward filed no exception to this finding, and the Board affirmed it. Leeward, understandably, does not contest the propriety of including this allegation in the complaint and has reduced its fee request to account for time devoted to defending against this charge. The *ALJ's fee award reflected this reduction.* ALJ EAJA Decision at 15, J.A. at 68.

In dismissing three of the allegations, the ALJ concluded, first, that Leeward had duly notified the Union of the impending layoff by virtue of the company's notice to the union steward. This notice, coupled with its later (post-layoff) discussion with a union representative, was deemed to satisfy Leeward's obligation to give the Union notice and an opportunity to bargain over the implementation and effects of the layoff. ALJ Decision at 6–7, J.A. at 79–80.

The ALJ turned next to the two allegations arising out of Leeward's assignment of unit work to non-unit employees (including the company president's daughter, Janice Fujimoto) and to subcontractors. Although Leeward had in fact done so unilaterally, the ALJ concluded that the company's actions fell comfortably within the ambit of the *Westinghouse* defense. *Id.* at 8, J.A. at 81. In view of uncontested evidence as to Leeward's precarious financial situation, the ALJ determined that the layoff was motivated solely by economic considerations. Also clear from the ALJ's review of the testimony was uncontradicted evidence of Leeward's past practice of transferring unit work. Both testimonial and documentary evidence demonstrated that the transfer of unit work both to non-unit employees and to subcontractors was part of Leeward's normal method of doing business. The record further showed that this practice existed before and continued during layoffs that befell unit employees in 1981. Far from being unaware of these practices, the Union had in fact attempted to secure language prohibiting transfers of unit work in the 1982 collective bargaining agreement. In the face of Leeward's steadfast refusal at the bargaining table to abandon its longstanding practice, the Union had withdrawn its proposal. *Id.* Leeward thus found complete vindication from

the ALJ on the three more substantial allegations enumerated by the charging party.

Neither party filed exceptions; the Board thereafter adopted the ALJ's findings and conclusions. The litigation, however, was not to be at an end. Having prevailed decisively on three of four allegations, Leeward applied for fees and costs pursuant to the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (1982 & Supp.1985); *see also* 29 C.F.R. § 102.143 (1987), a highly familiar if relatively new statute which we describe briefly in the margin.[6]

The General Counsel moved to dismiss the application on the grounds, among others, that the positions taken by the General Counsel in issuing the complaint and litigating the issues at the unfair labor practice hearing were "substantially justified." After a supplemental hearing, the ALJ concluded that substantial justification existed for the General Counsel's filing of the complaint and proceeding with the case to hearing. *Leeward Auto Wreckers, Inc.*, No. 37–CA–1969(E), mem. op. at 9 (ALJ Apr. 9, 1985), J.A. at 62 (hereinafter "ALJ EAJA Decision"). The ALJ went on, however, to conclude that the General Counsel was not substantially justified in continuing the litigation after "it became apparent that [Leeward] had a valid defense." *Id.* The ALJ awarded Leeward fees calculated from the date on which it became apparent that the Government's position was no longer justified (that is, the date on which Leeward put in its exculpatory evidence), including the time spent pursuing the EAJA application. *Id.* at 14–16, J.A. at 67–69.

Exceptions having been filed by both the General Counsel and Leeward, the Board reviewed the ALJ's decision and in April 1987 dismissed Leeward's fee application. *Leeward Auto Wreckers, Inc.*, 283 N.L.R.B. No. 85 (1987) (hereinafter "Board Decision"), J.A. at 48. The Board agreed with

---

**6.** As is by now well known, EAJA provides for an award of attorneys' fees to a party prevailing in an "adversary adjudication" before an agency unless it is shown that the Government's position was "substantially justified" or that special circumstances render an award unjust. 5 U.S.C. § 504(a)(1). Although the Act is silent on the meaning of the pivotal term "substantially justified," this court has held that the test is whether

the Government's position is "slightly more stringent than 'one of reasonableness.'" *Spencer v. NLRB*, 712 F.2d 539, 558 (D.C.Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). In other words, "[t]he judgment is whether the Government's actions were slightly more than reasonable." *Federal Election Commission v. Rose*, 806 F.2d 1081, 1090 (D.C.Cir.1986).

the ALJ that the General Counsel was substantially justified in issuing the complaint and proceeding to hearing. *Id.* at 4, J.A. at 51. Since Leeward adduced no evidence to contradict that provided by the Union, the Board reasoned, it was not unreasonable for the General Counsel to assume Leeward had acted unlawfully in the three ways described above. *Id.* However the Board disagreed with the ALJ's determination that the General Counsel should have stopped prosecuting the case after Leeward put on its defense. In the Board's view, the General Counsel had "no obligation to withdraw its case at that point since the General Counsel could not have known, prior to the issuance of the judge's decision, what, if any, weight he would give to [Leeward's] documentary evidence and the testimony of its witnesses vis-a-vis that produced by the General Counsel." *Id.* at 5, J.A. at 52. Critically for our purposes, the Board stated that the ALJ's finding that Leeward could avail itself of the *Westinghouse* defense was based in part "on his decision to resolve certain conflicts in testimony in [Leeward's] favor." *Id.* Since the ALJ could have resolved these conflicts in the Government's favor, the Board reasoned, the General Counsel was substantially justified in awaiting the ALJ's decision. *Id.* at 6, J.A. at 53.

This appeal followed. Leeward challenges the Board's findings, contending that the General Counsel was substantially justified neither in issuing the complaint nor in continuing to prosecute the case after the company had adduced evidence establishing an incontrovertible defense.

## II

■ We can readily dispose of Leeward's challenge to the Board's first determination. After reviewing the evidence, we are satisfied that substantial evidence undergirds the determination that the General Counsel was substantially justified in filing the complaint and proceeding to hearing. 5 U.S.C. § 504(c)(2).

Our review of the record demonstrates that, prior to the hearing itself, Leeward failed to provide the General Counsel with information concerning the company's ultimately successful defenses. At the precomplaint investigatory interview, the company president provided the Board's investigator with an affidavit going solely to the "direct-dealing" charge, the charge later *sustained* by the ALJ. File Memorandum from Thomas Cestare (Jan. 25, 1983), J.A. at 8. The company's response to the remaining allegations did little if anything to rebut them. The statements by Leeward's labor consultant, McGuire, to Board attorney Cestare addressed none of the elements of the *Westinghouse* defense; nor did they even indicate that the company intended to mount a *Westinghouse* defense. *Id.; see also* Affidavit of Michael McGuire at 2–3, J.A. at 36–37.[7] What is more, neither McGuire nor Fujimoto followed up on the discussion with Cestare. Although McGuire stated that he would furnish Cestare a statement of Leeward's position on the remaining allegations, no such statement was submitted in the week before the filing of the complaint. The company's stated justifications for its prehearing shortcomings (*e.g.,* Fujimoto's limited command of English and McGuire's being at sea in the mysteries of labor law) are lame. McGuire's command of the language has not been drawn into question, and he was, after all, serving as Leeward's labor consultant. We see on this record no justification for Leeward's failure to follow through (or to seek additional time to gather material to buttress Leeward's obviously powerful case on the merits).

McGuire apparently did tell Cestare during the precomplaint investigation of the layoff notice provided to the union steward,

---

7. McGuire's discussion with Cestare consisted of his assertion that the company's unilateral decision to subcontract out unit work and assign nonunit employees to perform such work was not illegal because the collective bargaining agreement prohibited neither practice. McGuire further informed Cestare of the Union's attempt in the 1982 negotiations to obtain such a prohibition. McGuire also presented Cestare with a study prepared by Leeward's accountant indicating that the price of steel had declined significantly, thereby precluding the company from employing workers at the union rate.

thereby draining the Union's no-notice allegation of much of its strength. McGuire's verbal representation, however, could well have been viewed by the Board investigators as insufficient to refute the lack-of-notice charge. First, as the old saying goes, talk is cheap. As we have seen, Leeward inexplicably failed to reduce its contention to writing and support it with affidavits. Leeward also failed to indicate whether, after giving notice, the company had provided the Union with an opportunity to negotiate over the layoff's effects. It goes without saying that mere notification of a *fait accompli* would, without more, be insufficient to defeat the failure-to-bargain dimension of the allegation.

Faced with its undisputed failure to furnish the General Counsel with evidence of its defenses, Leeward argues instead that the General Counsel fell woefully short in her obligation to investigate the charges (and potential defenses) before filing a formal complaint. Brief for Petitioner at 23, 26–29. Although it has been held that the General Counsel cannot simply rely on a *prima facie* case to justify filing a complaint, *see Debolt Transfer, Inc.*, 271 N.L.R.B. 299, 303 n. 7 (1984) (General Counsel must examine the practice of the parties), any such duty to investigate will obviously be shaped by the circumstances at hand. Here, for reasons that remain enshrouded in mystery, Leeward gave the General Counsel no indication, much less hard evidence, of its past practice of transferring unit work or its layoff-related discussions with the Union. Indeed, its only response to these manifestly serious charges was labor consultant McGuire's legally irrelevant verbal representations. Thus, we are satisfied that the General Counsel reasonably relied on the information she had in filing the complaint.

Having come this far, however, we are obliged to part company with the Board once the evidence was in fact adduced at trial. Once the evidence was in, continuing this litigation was not, we are persuaded, substantially justified. *Cf. Cinciarelli v. Reagan*, 729 F.2d 801, 804–05 (D.C.Cir. 1984) (partial awards are contemplated under EAJA). Any lingering uncertainty about the case should have evaporated in the face of the company's presentation on the merits.

The Board claims, as we understand it, that the General Counsel's continuation of the suit was somehow supportable because even considering Leeward's "incontrovertible defense," the Government could have prevailed. Board Decision at 5, J.A. at 52. In short, the Board's position is that miracles happen. Mindful of the secular nature of our inquiry, however, the Board does suggest as support for its odd position the purported existence of two conflicts in testimony. These conflicts, the Board claims, could have been resolved by the ALJ in favor of the General Counsel and altered the outcome of the suit.

In evaluating the Board's position, we are mindful that if witnesses take the stand, witness credibility can always be seized upon at the EAJA-liability hearing as an issue justifying continued litigation. By virtue of their very ease of invocation, credibility questions should, in order to defeat EAJA liability, be based upon an actual, material conflict which the trier of fact would be obliged to resolve in adjudicating the case. Our review of the record in this case convinces us that no such conflict existed here.

The first alleged "conflict" in the testimony involved Leeward's attempt to show that its assignment of unit work to nonunit employees during the layoff was consistent with established past practice. The Board claims that, in finding for Leeward, the ALJ necessarily rejected the testimony of company president Fujimoto and two other witnesses to the effect that "such assignments of work occurred only when unit employees were unavailable to perform such work due to absenteeism." *Id.* This is, to put it gently, an unreasonable characterization of the testimony. To be sure, Fujimoto did indeed testify that the company assigned unit work to nonunit employees when unit employees were absent; but it is beyond cavil that Fujimoto never said that Leeward did so *only* to fill in for absentees. *See, e.g.,* J.A. at 137, 141. The

evidence is squarely to the contrary, including (but not limited to) the fact that the president's daughter, Janice Fujimoto, on a daily basis performed unit work after working hours. *See, e.g.,* J.A. at 124. Similarly, the statements of the other two witnesses establish only the unremarkable proposition (at least in a small firm) that nonunit employees filled in for absentees, not that they *only* filled in for absentees. J.A. at 122, 168. The ALJ was by no means required to *reject* this testimony in order to hold in favor of Leeward; instead, he simply considered this testimony in context with other, substantial, uncontradicted evidence of Leeward's past practice of using nonunit employees to do unit work.

The second "conflict" relied on by the Board involved the Union's opportunity to bargain over Leeward's practice of transferring unit work. According to the Board, the ALJ rejected the union representative's testimony in favor of the testimony of Fujimoto and McGuire on this issue. Again, not so. The conflict the Board was apparently referring to concerned not whether the Union had an opportunity to bargain over the transfer issues, but rather whether, during the 1982 negotiations, the Union *withdrew* its bargaining demand for language prohibiting subcontracting and nonunit performance of unit work. *See* ALJ Decision at 5–6 & n. 5, J.A. 78–79 & n. 5. Since Leeward was required to show only that the Union had the *opportunity* to bargain, the question whether the Union ultimately withdrew its proposal in the process of doing so was not the critical issue. In light of the undisputed evidence of the Union's opportunity to bargain over the disputed issues,[8] the ALJ's finding on this point was not only correct, but was not dependent on the resolution of any purported testimonial conflict.

### III

For the foregoing reasons, we find ourselves in substantial agreement with the ALJ's analysis; under the applicable legal standard, the Board's determination lacked substantial evidence on the record as a whole.

In remanding the case, however, we are obliged to point out one area in the ALJ's exposition-fee calculation that lacks sufficient clarity. The ALJ's fee calculation appears to be premised on the theory that the Board's position became untenable to the extent of triggering EAJA liability on the fourth day of the six-day hearing. ALJ EAJA Decision at 14, J.A. at 67. Yet, his opinion suggests that EAJA liability arose only at the close of the hearing. *Id.* at 13, J.A. at 66. The post-hoc parsing evidenced in the fee calculation mandates, we believe, unrealistic calibration on the part of Board attorneys who were (correctly) found justified in filing the case in the first instance and then bringing the case on for hearing. If the Board's witnesses had collapsed on the stand, that would be one thing. But here, the full story of Leeward's activities came out only after the company put on its defense.

Under these circumstances, we believe the protective mantle of "substantial justification" was lost only at the conclusion of the hearing. The matter should have gone no farther, and certainly not to the point of preparing (at considerable expense) elaborate post-trial briefs when it should have been abundantly evident that the Board's "case" against the company had been wrecked at trial.

Accordingly, we remand the case for calculation of fees in accordance with this opinion; specifically, attorneys' fees will lie only for that period beginning after the close of the evidence and conclusion of the hearing before the ALJ.

*It is so ordered.*

---

8. The General Counsel cannot seriously dispute that the Union had an opportunity to bargain over the transfer of unit work and subcontracting issues. The union representative specifically testified that the Union discussed with Leeward the company's practice of subcontracting and transferring unit work to nonunit employees during the 1982 negotiations. J.A. at 163, 173. In addition, the representative admitted submitting to Leeward a written proposal that would have prohibited subcontracting. J.A. at 163.