851 F.2d 1501
 271 U.S.App.D.C. 274
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
John M. NADER, Petitioner,
v.
I.C.C. and United States of America.
 No. 87-1376.
 United States Court of Appeals, District of Columbia Circuit.
 July 1, 1988.
 
 Before SILBERMAN, WILLIAMS and DAVIS*, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record from the United States Interstate Commerce Commission and was briefed and argued by counsel for the parties. The court is satisfied, after reviewing the issues presented in light of the record, that disposition of the petition for review does not warrant a published opinion. See D.C.Cir.R. 14(c). After reviewing the record and considering the parties' presentations, we find that the Commission's denial of petitioner's request for fees and expenses under Sec. 504(a)(1) of the Equal Access to Justice Act, 5 U.S.C. 504(a)(1) (1982 & Supp.1988), was not supported by substantial evidence. For the reasons set forth in the accompanying memorandum, it is
 
 
 2
 ORDERED AND ADJUDGED by this court that the order of the United States Interstate Commerce Commission, the review of which is sought in this case, is hereby affirmed in part, reversed in part and remanded.
 
 
 3
 FURTHER ORDERED by this court, sua sponte, that the Clerk withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.R. 15 (August 1, 1987). This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.
 
 MEMORANDUM
 
 4
 Petitioner, John M. Nader, appeals a decision of the Interstate Commerce Commission affirming a denial of his request for attorney fees and costs under the Equal Access to Justice Act. We affirm in part, reverse in part and remand for an apportionment of fees and costs.
 
 I.
 
 5
 John Nader began his legal career in 1968 as an attorney in the ICC's enforcement division. In February 1972, he set aside his prosecutor's mantle and turned to the private sector, entering the employ of Robert M. Pearce, a transportation law attorney in Bowling Green, Kentucky. During the time Nader worked for Pearce, he was attorney of record for Cape Air Freight, Inc. on a number of filings with the ICC. Unbeknownst to Nader, Cape Air was secretly controlled by his employer, Pearce, and Pearce's partner, William Bennett.
 
 
 6
 In early 1975 the ICC's Bureau of Investigation (now known as the Office of Compliance and Consumer Assistance or OCCA) caught wind of allegations of fraud concerning Cape Air and initiated an inquiry into the company, examining its inception, organization, applications, operations, and true parties in interest. The investigation bore fruit, and in late 1977 the Department of Justice instigated federal grand jury proceedings against various individuals involved in the Cape Air transactions. Nader, who was not charged with any wrongdoing, appeared twice and testified. The grand jury proceedings led to the indictment and successful prosecution of Pearce, Bennett and several others for filing fraudulent documents with the ICC and concealing the true owners and parties in interest of Cape Air. At his post-trial sentencing, Pearce accepted full responsibility for the preparation and filing of the Cape Air submissions, characterizing the junior attorneys in his employ as unknowing and innocent dupes.
 
 
 7
 After spending some time behind bars, Pearce changed his tune. In June 1979, apparently hoping to attain an early parole, he offered to assist OCCA in an investigation of his former associates. OCCA took him up on the offer and supported his release from prison for the purpose of administering a polygraph test in Detroit. When Pearce suggested that his girlfriend's presence in his motel room would enhance his recall, OCCA obliged and arranged to transport the young woman to Detroit. Pearce then kept his part of the bargain, implicating Nader and other subordinate attorneys as willful abetters of his various fraudulent schemes.
 
 
 8
 In September 1979 OCCA launched a formal investigation and disciplinary proceedings to ascertain Nader's role in the Cape Air affair and determine whether he possessed the requisite qualifications to continue to practice before the Commission. Ex Parte No. 369, In the Matter of John M. Nader (not printed) (Sept. 14, 1979), Deferred Appendix (D.A.) 13. On January 12, 1981, OCCA gave Nader official notice of its intent to pursue disbarment proceedings against him on the grounds that he had knowingly and willfully prepared and filed fraudulent documents with the Commission. As the agency acted pursuant to the Administrative Procedure Act, 5 U.S.C. Sec. 554(b), the notice is known by the parties as the APA Letter. See D.A. 16.
 
 
 9
 Under 49 C.F.R. Sec. 1104.4 (1987), an attorney's signature on a document filed with the Commission constitutes his certification that he has read the document, is authorized to file it, and believes there are good grounds for its submission. After holding extensive adversary hearings on the OCCA allegations, an Administrative Law Judge held that Nader had violated Sec. 1104.4 and the ICC Canons of Ethics, 49 C.F.R. Secs. 1103.10, et seq., by, inter alia, failing to verify the representations made in his Cape Air filings. Ex Parte No. 369, In the Matter of John M. Nader (not printed) (May 1, 1984) (ALJ Merits Decision), Supplemental Appendix (S.A.) 1 at 15. While the ALJ made no finding that Nader had intentionally aided Pearce's scam, he concluded that under 49 C.F.R. Sec. 1104.4 Nader must be held to have had constructive knowledge of Pearce's fraud. Id. But taking into account the nature of Nader's infractions as well as his demeanor throughout the hearing, the ALJ found "no reason to believe" that Nader lacked "the requisite qualifications to represent others before this Commission." Id. at 16 (emphasis added). He therefore declined to impose sanctions.
 
 
 10
 On appeal by Nader, the ICC vacated the ALJ's opinion in so far as it had relied upon a constructive knowledge theory; OCCA had not given Nader notice that it intended to pursue such a theory in its APA Letter. Ex Parte No. 369, In the Matter of John M. Nader, 1 I.C.C.2d 667, 681. Cf. Rodale Press, Inc. v. FTC, 407 F.2d 1252, 1256 (D.C.Cir.1968) ("an agency may not change theories in midstream without giving respondents reasonable notice of the change"). Analysing the case against Nader purely as one alleging knowing and willful fraud, the Commission found insufficient evidence to support the charge. In the Matter of John M. Nader, 1 I.C.C.2d at 681.
 
 
 11
 Specifically, the ICC found that "substantial undisputed evidence of record show[ed] that Pearce routinely altered documents." Id. This included removing letters from files, retyping them, then replacing them, and, on numerous other occasions, removing pages from letters and court papers after they were signed by another attorney of the firm, and rewriting and retyping them in such a way as to make them appear intact. Pearce's secretary, Gail Amato, testified that Pearce spent hours "dumbing up files," and that Pearce routinely sent out letters under another attorney's name without that attorney's knowledge. Id. at 676. The Commission found the evidence "that Pearce routinely altered documents ... so strong that it cast[ ] considerable uncertainty on any attempt to prove by a preponderance of the evidence that Nader actually prepared any false documents." Id. at 681.
 
 
 12
 After this vindication, Nader applied for attorneys' fees and costs under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. Sec. 504 (1982 & Supp.1986). An ALJ determined that OCCA's actions in initiating an investigation and disciplinary proceedings against Nader were substantially justified and denied Nader's request. Ex Parte No. 369, In the Matter of John M. Nader (not published) (Dec. 18, 1985) (ALJ EAJA Decision), S.A. 3. On appeal, the Commission found the evidence against Nader "sufficient to justify OCCA's position in the litigation," Ex Parte No. 369, In the Matter of John M. Nader (not published) (July 1, 1987) (Commission EAJA Decision), S.A. 4 at 6, and affirmed the ALJ. This appeal followed.
 
 II.
 
 13
 The Equal Access to Judgment Act, 5 U.S.C. Sec. 504(a)(1) provides:
 
 
 14
 An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust.
 
 
 15
 Under Sec. 504(a)(1), the burden of proof is on the government to demonstrate that its actions were substantially justified. Spencer v. NLRB, 712 F.2d 539, 546 (D.C.Cir.), cert. denied, 466 U.S. 936 (1983). The sole issue on appeal before us is whether OCCA satisfied that burden.
 
 
 16
 Although the Act does not define what is meant by substantial justification, the Supreme Court has recently made clear that a position satisfies the test if it "ha[s] a reasonable basis both in law and in fact," Pierce v. Underwood, 56 U.S.L.W. ----, [slip op. at 10] (June 27, 1988), or is "justified to a degree that could satisfy a reasonable person," id. at ----, [slip op. at 12]. The Court expressly rejected this court's formula, which required that the Government's actions be "slightly more" than reasonable. See id. at ----, [slip op. at 13-14] (quoting Spencer v. NLRB, 712 F.2d at 558). The Commission, reviewing Nader's EAJA claim on appeal, found that OCCA's prosecution of Nader was reasonable. We must uphold its decision on this matter if supported by substantial evidence. 5 U.S.C. Sec. 504(c)(2); see Leeward Auto Wreckers v. NLRB, 841 F.2d 1143, 1147, 1149 (D.C.Cir.1988).
 
 
 17
 It is clear from the statute that the " 'position of the agency' means, in addition to the position taken by the agency in the adversary adjudication, the action or failure to act by the agency upon which the adversary adjudication is based." 5 U.S.C. Sec. 504(b)(1)(E); Federal Election Commission v. Rose, 806 F.2d 1081, 1086-87 (D.C.Cir.1986) ("[T]he Government must now show that both its position in the litigation and its conduct that led to the litigation were substantially justified.").
 
 
 18
 It would be hard, we think, to fault the Commission for investigating the possibility that Nader's role in the filing of the key Cape Air documents was such as to justify disciplinary proceedings against him--though one may well question some of the methods of investigation. But when the investigation turned up as little as it did, we think that the Commission was not substantially justified in pressing forward. The APA Letter effectively threw down the gauntlet, claiming that OCCA had enough evidence to show that Nader had willfully filed documents containing statements that he knew to be false, with the intent of perpetrating a fraud on the Commission. See D.A. 16, 19.
 
 
 19
 The Commission suggests that OCCA is entitled to great leeway in pursuing disciplinary proceedings because of their non-punitive character. We recognize that non-punitive goals support professional disciplinary proceedings--notably, sparing the public and (here) a government agency the hazards of dealing with the unscrupulous. But the presence of these nonpunitive goals is already reflected in the burden of proof that OCCA had to satisfy. To prevail against Nader, it had to prove its charges only by a preponderance of the evidence, not beyond a reasonable doubt or by clear and convincing evidence. It would be a sort of double-counting to set a special standard to evaluate whether OCCA was substantially justified. At a minimum, its decision to prosecute ought to have reflected a reasonable belief that a preponderance of the evidence supported the charges it made. Here, because the evidence it marshaled against Nader was not remotely up to this task, its decision to prosecute was not substantially justified.
 
 
 20
 Before reviewing that evidence, we think it worth noting that persons intimately familiar with the Cape Air scam counselled that the Nader prosecution be abandoned. Based on his experience as lead counsel for the Commission in the original Cape Air proceedings, J. Preston Proffitt, Jr. advised his OCCA colleagues to drop the Nader prosecution for want of sufficient evidence. Charles Wagner, Assistant Director of OCCA voiced similar views. Further, William Pease, the Assistant U.S. Attorney in charge of the earlier grand jury proceedings, strongly warned OCCA officials against relying upon the credibility of either Pearce or Bennett. Disregarding these pleas for restraint, John G. Giorgio, lead investigator and prosecutor in the Nader proceedings, resolved to push on.
 
 
 21
 When OCCA brought its case before an ALJ in January 1983, its marquee was clearly less than stunning. Evidently recognizing Pearce's vulnerability, OCCA cut him from the show. This left virtually nothing to fill the evidentiary gap created by the Pearce office practices, with which it was by then thoroughly familiar. OCCA offered only the following: First, Floyd Johnson, an ICC investigator, testified that statements made in the Sub-7 and Sub-8 applications and the Film Transit answer were false, inaccurate and misleading. Next, an FBI handwriting expert testified as to the authenticity of Nader's signature on the key documents. Third, William Bennett, a convicted con man and perjurer, said that Nader had expressed doubts as to the validity of statements in the answer after the answer had been filed. Finally, it introduced Nader's grand jury testimony. This in large part confirmed the basic problem developed in Cape Air proceedings--the contradiction between the papers filed and the truth. With such a cast, we are at a loss to explain how OCCA let this one out of the studio.
 
 
 22
 OCCA's case focused on three areas: (1) Nader had signed applications on behalf of Cape Air for extensions of operating authority, known as Sub-7 and Sub-8. These contained false statements about the ownership and control of Cape Air, specifically omitting or even denying Pearce's role. (2) Nader had signed an answer responding on Cape Air's behalf to a complaint by Film Transit, Inc. It contained falsities similar to those of the Sub-7 and Sub-8 applications. (3) Nader had, OCCA claimed, endorsed a check for $75,000, made out to him as attorney of record for Cape Air, tendered to him by S.J. Clair in partial payment for Clair's purchase of all of Cape Air's stock. We do not believe that the evidence on the three items, taken singly or in the aggregate, was strong enough for OCCA to be substantially justified in its claims that Nader engaged in willful and knowing misrepresentations.
 
 
 23
 1. The Sub-7 and Sub-8 applications. In October 1972 Nader, as attorney for Cape Air, filed an application with the ICC for additional operating authority (the Sub-7 application). Supporting the application were verified statements signed by Kelly Huckleby and George Ford, which falsely represented Mr. Huckleby as owning fifty percent of the Cape Air's stock, exaggerated the company's operations, and misrepresented its financial condition. During that same month, Nader also filed another application for operating authority, Sub-No. 8, with similarly incorrect information.
 
 
 24
 Before the grand jury Nader testified that in completing the applications he had simply used the ownership, officer, and financial information supplied to him by Pearce, and that he was unaware that the information was fraudulent. OCCA came up with no evidence to contradict this testimony. Supporting Nader's version of the story was the fact that when, a few days after filing the Sub-7 application, he learned that Wanda P. Bennett (William Bennett's wife) was president of Cape Air, he immediately sent a letter to the ICC correcting the inaccuracy. See Commission Merits Decision, S.A. 2 at 14.
 
 
 25
 This is not a case where the government was defeated at trial by the surprising strength of the opposition's case in chief. Cf. Leeward Auto Wreckers, Inc. v. NLRB, 841 F.2d 1143 (D.C.Cir.1988). The Commission appears to believe that the government is "substantially justified" in pressing ahead with a case whenever there is a nominal credibility dispute, no matter how lopsided the evidence may be when taken as a whole. In its EAJA ruling it asserted that "[w]here ... the determination of who should ultimately prevail turns on issues of credibility, a prosecutor may properly leave such issues of credibility to the fact finder." Commission EAJA Decision, S.A. 4 at 6. This notion is flatly inconsistent with the law of this circuit. As we noted recently in Leeward Auto Wreckers:
 
 
 26
 [I]f witnesses take the stand, witness credibility can always be seized upon at the EAJA-liability hearing as an issue justifying continued litigation. By virtue of their very ease of invocation, credibility questions should, in order to defeat EAJA liability, be based upon an actual, material conflict which the trier of fact would be obliged to resolve in adjudicating the case.
 
 
 27
 841 F.2d at 1148 (emphasis added).
 
 
 28
 Here, as OCCA had no credible witnesses, there was no credibility conflict. The evidence of Nader's complicity lay solely in a legal presumption; this was completely undercut by the evidence of Pearce's manipulative proclivities.
 
 
 29
 2. The Film Transit answer. In 1973 Film Transit, Inc. filed a complaint against Cape Air alleging that the real parties in interest in Cape Air had not been disclosed to the ICC, that the two undisclosed principals of Cape Air were Pearce and Bennett, that both Pearce and Bennett owned interests in other motor carriers, and that the purported owner of Cape Air, R.P. Jones, was merely a front. Film Transit, Inc. v. Cape Air Freight, Inc., No. MC-C-7996 (I.C.C., filed Jan. 30, 1973). The complaint also alleged that Cape Air had been formed to obtain ICC operating authority for the purpose of sale rather than operation.
 
 
 30
 Nader, as attorney for Cape Air, filed an answer to the complaint in April 1973. The answer denied the substance of the complaint, stating in particular that (1) Bennett and Kelly Huckleby (the purported owners in 1972) approached him and requested him to represent Cape Air in the Sub-7 and Sub-8 applications, that (2) Pearce had never represented Cape Air before the ICC, and that (3) Cape Air's attorneys had examined the company's files, records, minute books, and stock books and found no evidence of illegal control by Pearce. Nader later testified that he read at least portions of the answer (including the passages referring to the lawyers' examination of Cape Air's books and records). In reliance on the answer, the ICC dismissed the allegations in the complaint regarding illegal control of Cape Air.
 
 
 31
 Nader's grand jury testimony contradicted much of the information provided in the answer. He told the grand jury that Pearce originally approached him, gave him the necessary papers, and instructed him to file the applications for Cape Air. He further testified that he believed Cape Air to be Pearce's client because he was acting under the direction of Pearce when he filed the Sub-7 and Sub-8 applications and the Film Transit answer, and because Pearce had personally prepared much of the answer. In addition, Bennett, Pearce's partner-in-crime and fellow con man, was willing by the time of the APA Letter to testify that Nader had expressed doubts as to the truth of various representations made in the answer soon after the answer was filed.
 
 
 32
 To prevail on these charges, OCCA had to prove by a preponderance of the evidence that Nader had actual knowledge that the answer at the time he signed it contained false and misleading statements. Its case against Nader was, however, severely hamstrung by the fact that Pearce was known to have altered many documents after his associates had attested to their accuracy. The evidence of this practice effectively rebutted the 49 C.F.R. Sec. 1104.4 presumption that, as attorney of record, Nader had read and verified the information contained within the answer.
 
 
 33
 The Commission does not disagree in principle, and concedes that Pearce often altered other attorney's submissions, but advances three possible justifications for OCCA's perseverance. First, it notes that Nader admitted that before attesting to the veracity of the representations made within the answer he had read the following portion: "We would like to comment concerning the illegal common control charge concerning Robert M. Pearce, Attorney. We found no evidence, and we repeat, NONE, to support this charge. We were permitted, as counsel, to examine all files, records, the minute book and stock book." Answer of Cape Air Freight, Inc., Exhibit 25 at 3. As Nader conceded that he had not in fact examined Cape Air's files and records, the Commission asserts that he has in effect conceded the validity of part of the case against him. But the quoted statement is couched in the first person plural. A perfectly natural reading, and so far as appears the one that Nader accepted, was that he and other attorneys from his firm had collectively made the examination. If a law firm partner made the statement, readers would understand that in all likelihood subordinates had done at least some of the examining. We think the inference readily runs the other way: an associate's statement that "we have examined" documents can be understood to comprise examinations that the associate's chief tells him he has made.
 
 
 34
 Second, the Commission points to the testimony of William Bennett that Nader had expressed reservations to him regarding the truth of various representations in the Film Transit answer. At most Bennett's testimony establishes that after the filing of the answer Nader had become suspicious that something fishy was going on. Testimony of Bennett, Transcript (TR) at 203-04. In any event, the Commission itself noted that there was "overwhelming evidence ... that ... [Bennett and Pearce] have serious credibility problems," S.A. 2 at 13, and that the ALJ in the Cape Air revocation proceeding had "noted extensively their status as criminals, con men, and masters of half-truths," id. This falls far short of what is needed to establish knowing and deliberate fraud.
 
 
 35
 Finally, the Commission points out that although witnesses did indeed testify that Pearce frequently edited the work product of other attorneys, even after they had signed the documents, Nader offered no testimony (not even his own) that this had happened with the Film Transit answer. The Commission is of course correct, but given the weakness of OCCA's affirmative case, the absence of an airtight defense cannot justify the decision to prosecute. The Commission itself noted in its merits decision that "the overwhelming weight of the evidence" supported the conclusion that "the documents Nader prepared or acquiesced to were subsequently altered." 1 I.C.C.2d at 680. It did not even mention the absence of any Nader testimony pinpointed to the issue of paper substitution in the Film Transit answer, so it is hard to see why the omission should seem so significant at this stage. In making its EAJA determination, the Commission is not entitled to focus exclusively upon the few strands of evidence--or gaps--that support OCCA's position. See Cornella v. Schweiker, 728 F.2d 978, 984 (8th Cir.1984) ("the government's position [cannot] be deemed reasonable in fact when it relied on an isolated part of the evidence and ignored the other overwhelming evidence").
 
 
 36
 3. The check. In August 1974 Nader received a $75,000 check made out to him in his capacity as attorney-in-fact of Cape Air, from S.J. Clair, in partial payment for Clair's purchase of the company. When Nader telephoned Clair to find out why the check had been made out in his name, Clair told him he was to be the escrow agent for the deal. Still confused, Nader approached Pearce about the matter. Pearce provided no coherent explanation for Nader's newfound role as escrow agent, but nonetheless asked Nader to endorse the check and hand it over to him. Nader refused to sign the check and handed it over to Pearce unendorsed. See ALJ Merits Decision, S.A. 1, Appendix at 6-8. Pearce testified in a 1979 hearing related to Cape Air that he subsequently forged Nader's signature and cashed the check.
 
 
 37
 In its APA letter, OCCA informed Nader that it intended to establish that he had endorsed Clair's $75,000 check over to Pearce. When it sent the letter, OCCA was fully aware that Pearce, its star perjurer, acknowledged having forged Nader's endorsement. Nader argues that OCCA's determination to pursue the matter evidences a blind and malevolent attitude--typical, he argues, of its attitude throughout the proceeding. Although Nader's claims of prosecutorial misconduct seem not entirely frivolous,[1] the record as to these claims is sparse, and their resolution is not necessary to our disposition of this case. We think, however, that OCCA's inclusion in the APA Letter of the totally false charge, then known by it to be totally false, bears upon whether its conduct as a whole was substantially justified.
 
 
 38
 The Commission in its brief argues that the question of who endorsed the check is, and always was, immaterial. It contends that the check episode suggested that Nader ought to have realized Pearce's unlawful connection with Cape Air. But in its merits decision the Commission drew no adverse inference at all from the check episode. Again the Commission seems in its EAJA decision to have put a completely new spin on old evidence. Moreover, if the intended function was what the Commission now suggests, we are baffled as to why OCCA made the false assertion in the APA Letter. Finally, a finding that Nader erred in failing to follow up on his suspicions regarding the check would not establish that Nader had committed willful and knowing fraud.
 
 Conclusion
 
 39
 While the OCCA investigation into Nader's conduct was substantially justified, its decision to prosecute, manifested in the APA Letter, was not. Fees and costs incurred after OCCA sent the letter are due under EAJA. We therefore reverse and remand for an apportionment of fees and costs in accordance with this memorandum.
 
 
 40
 Affirmed in part, reversed in part and remanded.
 
 
 
 *
 Judge Davis, of the United States Court of Appeals for the Federal Circuit, sat by designation pursuant to 28 U.S.C. Sec. 291(a) (1982), but has since died and thus did not participate in the decision
 
 
 [1]
 The evidence of prosecutorial misconduct in this case presents a truly peculiar picture of overzealousness, unchecked by prudent restraint or good judgment. Among the numerous examples described by petitioner, we comment only on the more striking
 First, there appear to have been several instances of OCCA withholding potentially exculpatory information from Nader. For example, a doctor's report casting doubt on Pearce's credibility and memory was withheld. Even though OCCA ultimately decided not to call Pearce as a witness at Nader's hearing, it is apparent that it used information supplied by him in building its case against Nader. OCCA attorney John W. Giorgio also testified that OCCA transcripts of a taped interview with Bennett (intended as answers to interrogatories) that were turned over to Nader were inaccurate and incomplete.
 Second, OCCA's reliance on Bennett as its main witness against Nader must be viewed as extremely questionable at best. OCCA knew that Bennett was an acknowledged perjurer and had a propensity to be manipulated by Pearce and suffer memory lapses.
 Third, in its obsessive pursuit of the Nader prosecution OCCA not only ignored the restraining counsel of the two senior OCCA officials, J. Preston Proffitt and Charles Wagner, who recommended that the prosecution be discontinued, but also subjected these officials to investigations questioning their integrity. Both were subsequently exonerated.